UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AJ ENERGY LLC, | ) | Case No. 18-cv-03735-JMF (BCM) |
| | ) | |
| Plaintiff, | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| v. | ) | |
| | ) | |
| WOORI AMERICA BANK, WOORI BANK, and | ) | |
| Does 1 through 50, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF
# WOORI BANK'S MOTION FOR SANCTIONS

O'HARE PARNAGIAN LLP
82 Wall Street, Suite 300
New York, New York 10005
Tel: (212) 425-1401
Fax: (212) 425-1421

*Co-Counsel for Defendant Woori Bank*

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .................................................................................................1

II. BACKGROUND...............................................................................................................6

    A.    The Parties .............................................................................................................6

    B.    Plaintiff's Allegations ...........................................................................................7

    C.    The Documents Attached to the FAC Bear Multiple Indicia of Fraud That Any Reasonable Investigation Should Quickly Have Revealed............................8

    D.    The Parties' Post-Filing Correspondence ...........................................................11

    E.    Deutsche Bank's Testimony ...............................................................................12

III. ARGUMENT ................................................................................................................13

    A.    Rule 11(b) Applies to the FAC ...........................................................................13

    B.    Sanctions Are Appropriate Because the FAC Violates Rule 11(b) .....................14

        1.    Plaintiff's Claims Lack Any Reasonable Evidentiary Support.................15

        2.    No Reasonable Investigation Was Conducted...........................................18

        3.    Plaintiff's FAC Was Brought for an Improper Purpose ...........................21

    C.    Plaintiff's Unreasonable Failure to Withdraw This Lawsuit Is Also Sanctionable........................................................................................................22

    D.    The Court Should Dismiss the FAC with Prejudice and Award Attorneys' Fees and Costs.....................................................................................................23

        1.    The Court Should Dismiss the FAC with Prejudice ................................24

        2.    The Court Should Award Attorneys' Fees and Costs...............................24

IV. CONCLUSION..............................................................................................................25

Defendant Woori Bank ("Woori Bank" or "Defendant"), by and through its counsel, respectfully submits this memorandum in support of its motion for sanctions against Plaintiff AJ Energy LLC ("Plaintiff") and its attorney Ruth Cam, pursuant to Fed. R. Civ. P. 11 ("Rule 11").

## I. PRELIMINARY STATEMENT

Plaintiff's facially incredible First Amended Complaint ("FAC") (Dkt. 19) alleges in the least plausible of terms that Defendant stole ₩8 billion (nearly $10 billion) by taking the proceeds of two wire transfers.   Both transfers were allegedly sent from a Deutsche Bank account held by one of Plaintiff's colleagues to a Deutsche Bank "common account" held by Woori Bank. According to the FAC, Woori Bank was supposed to deposit these funds in Plaintiff's account at Woori Bank, but instead kept the money for itself.

Apart from the legal deficiencies of the FAC which warrant its dismissal that have been detailed in Woori Bank's Motion to Dismiss, the FAC is obviously premised on purported documentary support that waves multiple red flags, each of which mandate further investigation into the authenticity of those documents.   And, as detailed below, any basic investigation would reveal that, for numerous irrefutable reasons, Plaintiff's claim cannot be genuine.

Defendant tried in vain to curtail this frivolous litigation, which is in its fourth iteration, having been commenced in various incarnations in Korea, California, and New York State Court. In early April 2018, before Plaintiff's counsel filed the FAC in May 2018 and well before Defendant's counsel's service of a copy of this motion upon Plaintiff's counsel in June 2018, Woori Bank twice alerted Plaintiff's counsel to various bases for investigating the glaring inconsistencies that permeate the FAC.

A reasonable inquiry into illegitimacy of Plaintiff's claims only begins with the lack of any plausible explanation as to how Plaintiff—a four-member limited liability company formed under the laws of Nevada—had access to this staggering sum of money, which is premised on a

series of inconsistent and nonsensical transaction documents.   Sworn testimony from officials at Deutsche Bank and Woori Bank each pointedly and completely refute Plaintiff's allegations that the two transactions at issue—the cumulative transfer of €8 billion—ever occurred.

To be clear—Woori Bank does not predicate this motion only on denials that the transactions occurred, although those denials are complete, vigorous, and exceptionally well grounded.   Rather, any notion of the authenticity of the documents that supposedly form the foundation of these preposterous transactions crumbles under objective review.   Because a simple analysis proves, inter alia, that the documents cannot be authentic, the allegations are not only frivolous but Plaintiff's filing of the FAC warrants the imposition of sanctions.

Plaintiff's first Complaint, filed in a New York court (after filings in Korea and California) (the "Complaint"), relied on an supposed "Funds Transfer Confirmation" dated January 8, 2015 purportedly reflecting the transfer of €3 billion from Deutsche Bank to First Clearing LLC.   This document bore two Unique Transaction References or UTRs: DEUTDEFFXXX589360436 and DEUT997856743216.   Obviously, this record could not support any allegation that Plaintiff could conceive against Defendants, as it only refers to a supposed transaction between Deutsche Bank and First Clearing LLC.   Yet this document acts as a Rosetta Stone that begins to reveal the falsity of the documents relied upon now by Plaintiff.

After an uncontested removal of this Complaint to this Court, counsel for Woori Bank advised Plaintiff that the First Clearing LLC document was irrelevant to any claim against Woori Bank.   Rather than heed the alarm and examine the legitimacy of the other documents provided by its client, Plaintiff's counsel apparently elected to simply substitute another "Funds Transfer Confirmation" as Exhibit 5 to the FAC, filed in late May 2018.   This served as Plaintiff's new—but not improved—documentary basis for alleging that a transfer of €3 billion from Deutsche

Bank to Woori Bank took place on October 7, 2015.   Remarkably and improbably, this new

Exhibit records the second UTR also as DEUT997856743216.

A "Transfer Slip Information," accompanying the FAC as page 12 of Exhibit 9, provides

Plaintiff's documentary basis for alleging the supposed transfer of €5 billion from Deutsche

Bank to Woori Bank.   This third exhibit yet again provides DEUT997856743216 as the UTR

for this alleged transfer on February 13, 2017, as alleged in paragraph 115 of the FAC.

These identical UTRs prove in various objective and easily identifiable ways that these

documents simply cannot be genuine.   First, the three documents provided by Plaintiff record

the UTRs for three transactions—imagined to have taken place in January 2015, October 2015

and February 2017—each with Unique Transaction References of DEUT997856743216.

And other facts compel the conclusion that these documents are the concoctions of a

scammer.   Under the system that uses UTRs, the final set of characters for each UTR is a

sequential transaction number, while the characters appearing just before that last sequential

series constitute a date reference.   This date reference would perforce include two or four

characters to denote the year in which the transaction took place.

Thus, any UTR here would have to include the characters "15" or "2015" for the first

alleged transfer and "17" or "2017" for the second transfer.   However, no sequence of numbers

in the gibberish that comprise these UTRs contains anything resembling the date reference that it

must contain to be authentic—the numbers "15," "2015," "17" or "2017" are nowhere to be

found in the UTRs that supposedly refer to these transactions.

That each UTR includes this simple date code for each particular transaction is not an

obscure fact.   As described below, internet research readily decodes the constituent components

of the Unique Transaction Reference.   A reasonable investigation into the validity of the

documents and the UTRs stated therein should have been conducted, especially after Defendants apprised Plaintiff of blatant irregularities in these documents, and the facts of the forgeries would have become readily apparent.[1]   The UTRs bear witness that the documents containing them are not legitimate but are part of a bizarre scam.

Although incredible on their face, the FAC's six causes of action depend entirely on the existence of the two alleged wire transfers and the "common account" from which the funds were purportedly stolen.   But, to state it most simply, the FAC's alleged €8 billion in wire transfers and the "common account" are complete fabrications.

If the numerous indicia of falsity on the face of the documents that accompany the FAC were not enough, Deutsche Bank has also confirmed in response to the initial Complaint (Dkt. 1-1), under oath, that it did not execute either of the wire transfers and that the "common account" identified in the pleadings does not exist.   This affidavit was provided to Plaintiff *before* it filed the FAC.   Clearly, this is not a case in which a party is accused of merely shading the truth, downplaying inconvenient details, or drawing unreasonable inferences from ambiguous documents and testimony, where Rule 11 sanctions might chill a lawsuit that otherwise had some merit.   Here, one party has relied on documents that have been completely fabricated to form the factual bases of its lawsuit and then doubled down with an amended pleading after receiving incontrovertible proof that the case is a sham.   This is the archetypal case for when Rule 11 sanctions are not only warranted, but also necessary to deter such misuse of the court system.

The FAC violates Rule 11 in at least three ways.   First, the pleading lacks any

---

[1] In addition, the UTR code also includes a distinct reference to the month and day for each transaction, with two basic systems for recording the month and date.   (*See* Declaration of Jeffrey S. Lichtman ("Lichtman Decl. or "Lichtman Declaration") Exs. 7-10.) Whatever system used by a bank in setting forth a transaction's month, date and year, however, the dates of the transactions as imagined by Plaintiff are absent in the UTRs accompanying the FAC.

objectively reasonable evidentiary basis and discovery cannot reveal any such evidentiary basis. Indeed, there is irrefutable evidence that the transactions did not occur, and that Plaintiff has submitted forged documents to this Court.   Second, there could not have been a reasonable pre-suit investigation given the glaring inconsistencies and other red flags in the FAC and on the face of the documents attached to the Complaint and the FAC—including a particularly dubious document that Plaintiff has misleadingly omitted from the FAC after Defendants' Motion to Dismiss showed the document to be fabricated.   Third, the FAC serves an improper purpose, as it duplicates litigation filed by Plaintiff and its colleagues in Korea and California, revealing a pattern of forum shopping, apparently to supply enough leverage to extort a settlement.

Plaintiff's refusal to dismiss this lawsuit when confronted not only with the indicia of fraud on the face of the Complaint and FAC, but also with Deutsche Bank's sworn testimony, is an independent violation of Rule 11.[2]   That violation subjects Plaintiff to sanctions even if the FAC somehow complied with Rule 11 when it was filed, which it did not.

Aside from the expense Plaintiff's bad faith conduct has foisted upon Defendant, the fraudulent lawsuit also has real-world effects.   Under Korean law, when a lawsuit seeking in

---

[2] On May 4, 2018, Woori Bank provided Plaintiff's counsel with Deutsche Bank's affidavit, executed by Mohamed Kaba on May 3, 2018 (the "Kaba Aff.").   That affidavit refers to allegations made by Plaintiff in its Complaint, as the FAC had not been filed as of May 3, 2018. On June 15, 2018, Woori also served on Plaintiff's counsel a version of this Motion that is nearly identical to this Motion (*see* Lichtman Decl. ¶ 2 & Ex. 11) to provide Plaintiff with the 21-day safe harbor Rule 11 affords.   *See* Fed. R. Civ. P. 11(c)(2).   Since then, Woori Bank has received, and includes with this Motion, an updated Deutsche Bank affidavit from Mr. Kaba executed on July 2, 2018 ("Kaba July 2018 Aff."), which reaffirms the Kaba May 2018 Affidavit in its entirety.   (*See* Kaba July 2018 Aff. ¶ 4.)   In addition, the updated Deutsche Bank affidavit refutes the alleged occurrence of the transactions as alleged in the FAC with references to the FAC and calls into serious question the authenticity of numerous exhibits appended to the FAC. Although both affidavits are substantially the same in all material respects, this Memorandum will refer to the Kaba May 2018 Affidavit, as that was previously served on counsel for Plaintiff well in advance of the filing of this Motion, in both May and June of 2018.

excess of a specified percentage of a corporation's market value is filed, there is an obligation to disclose the existence of that lawsuit, regardless of its merit.   Thus, Woori Bank filed a Form 6-K with the SEC, disclosing the existence of the lawsuit.   This generated reputational impacts for Woori Bank, exacerbated by the fact that it is a financial institution with significant client deposits.   Plaintiff's conduct also may have affected Woori Bank's shareholders (it is unknown at this point whether Plaintiff or its affiliates had taken any position in Woori Bank's securities around the time of this disclosure).

There is little question that sanctions are warranted.   The sanctions should be strong enough to deter Plaintiff (and other would be plaintiffs) from attempting to utilize the judicial system to extort money through the use of dubious or forged documents and facts manufactured out of whole cloth.   Accordingly, Defendants respectfully request that the Court exercise its discretion to dismiss the FAC with prejudice and award Defendants their fees and costs incurred in bringing their Rule 12(b)(6) motions and this Motion and impose such other and additional punitive sanctions as the Court determines are appropriate.

## II. BACKGROUND

### A.    The Parties

Plaintiff is a Nevada limited liability company, whose exact business is not stated.   (FAC ¶ 1.)   Plaintiff alleges it has three business partners, who were among the senders and recipients of the two wire transfers alleged in the FAC.   "NRG Co., Ltd." is allegedly Plaintiff's "Korean partner," and Plaintiff "is also on the board of directors in NRG."   (*Id.* ¶¶ 12, 20.)[3]   Plaintiff and NRG Co. allegedly have a joint venture agreement and a "Business Asset agreement" with "Hestiun Finance Limited, a company registered in the United Kingdom."   (*Id.* ¶¶ 12, 19.)

---

[3] Plaintiff fails to explain how a Nevada LLC might sit on the board of a Korean company.

6

According to the FAC, "Hestiun gave NRG power of attorney to conduct the investments" (*id.* ¶ 16), vaguely defined as involving "precious commodities and securities" and the "South Korean Economy." (*Id.* ¶¶ 26, 52.) Plaintiff also claims to be party to an unspecified "larger business/asset transaction" with "Maybrook Financial Group Ltd." whose business is not specified. (*Id.* ¶ 32.)

Woori Bank is "organized under the laws of the Republic of Korea, with its principal place of business in Seoul, South Korea." (*Id.* ¶ 4.) Plaintiff and NRG Co. have accounts at Woori Bank. (*Id.* ¶¶ 24, 33.) "Woori Bank's CEO Lee Kwan-goo" is "suspected" by Plaintiff "of being the instigator of the theft." (*Id.* ¶ 27.) The FAC also baselessly asserts that Woori Bank is engaged in ongoing money laundering using Plaintiff's bank account (*id.* ¶ 36), but no cause of action appears to turn on that allegation.[4]

**B.      Plaintiff's Allegations**

Plaintiff's six causes of action rest entirely on two alleged wire transfers, one for €3 billion and one for €5 billion. According to the FAC, on an unspecified date in 2015, "Hestiun agreed to transfer €3 Billion to the common account which was then transferred to NRG's Account Number . . . with NRG to be credited to NRG's account at Woori Bank." (FAC ¶ 21.) Plaintiff alleges that "[a] Common Account like Woori Bank's account … is a special account used between Woori Bank and Deutsche Bank for transactions and it is called a common account (common account and/or correspondent account), where it is used worldwide to transact large sums of funds." (*Id.* ¶ 17.) Woori Bank allegedly "pulled the funds from the common account and failed to further credit the funds to NRG's account at Woori Bank." (*Id.* ¶ 25.)

Apparently undeterred by the alleged theft of the first €3 billion, the FAC also claims that

---

[4] Woori America Bank has been dismissed as a defendant in this action. (Dkt. No. 28.)

"on February 13, 2017 Plaintiff arranged another transaction from Deutsche Bank to Woori Bank's common account, this time an amount of €5 billion."   (*Id.* ¶ 33.)   Along with the first alleged wire transfer, these funds were allegedly diverted to Woori Bank's "own transit account," not sent to Plaintiff.   (*Id.* ¶ 64.)   As irrefutable evidence now demonstrates, these transactions never occurred.   (Kaba Aff. ¶¶ 3-10; Declaration of Yun Su Park ("Park Decl.") ¶¶ 3-6.)

Litigations based on these fabricated transactions were filed around the world in an effort to obtain a toehold in its extortion scheme.   Plaintiff's alleged partner, NRG Co., initiated a proceeding in a Korean court against Woori Bank based on the alleged €3 billion wire transfer (the "Korean Litigation").   (Park Decl. ¶ 7.)   The Korean court dismissed that case due to a lack of evidence that the alleged €3 billion wire transfer ever occurred.   (*Id.* ¶ 8, Ex. 1.)   Plaintiff also sued Woori Bank and Woori America in California state court based on the alleged €5 billion wire transfer.   *See AJ Energy, LLC v. Woori America Bank*, No. 30-2017-00942033-CU-MC-CJC (Orange Cty. Sup. Ct. filed Sept. 6, 2017) (the "California Litigation").   Plaintiff never served either Defendant with the complaint in the California Litigation; instead, Plaintiff unilaterally dismissed the case without prejudice, after "inform[ing] the court that settlement discussions are ongoing."   (Lichtman Decl. Exs. 4, 5.)   Plaintiff's efforts to abuse the legal system are by no means limited to this Court or even the United States.

C.   **The Documents Attached to the FAC Bear Multiple Indicia of Fraud
     That Any Reasonable Investigation Should Quickly Have Revealed**

The FAC refers to Exhibit 5 as evidence of the alleged €3 billion wire transfer.   (FAC ¶ 22.)   Exhibit 5 appears to be a message sent through the Society for Worldwide Interbank Telecommunication ("SWIFT") messaging system (*see id.* ¶ 23), concerning a wire transfer of €3 billion involving Hestiun and NRG Co.

8

The initial Complaint attached a strikingly similar document (*see* Dkt. 1-1 at 28), as purported evidence for the €3 billion wire transfer.   That document also identified a €3 billion transaction, and had the exact same "Reference No." of "DEUT997856743216" and "Transaction ID" of "090512DEUTDEFFXXX886479."   (*Id.*)   However, the document attached to the initial Complaint identified "First Clearing, LLC" as beneficiary, and the "message text" stated that the transfer was in favor of "beneficiary Bank Wells Fargo Bank N.A. San Francisco … for further credit to Contained Media Group, LLC"—all entities that are not otherwise named in the Complaint or FAC.   (*Id.*)

Woori Bank noted these inconsistencies in its Motion to Dismiss (Dkt. 10 at 7-11), but the FAC does not explain how or why the two documents, with different beneficiaries and different dates, would share the same Reference No. and Transaction ID.   In an attempt to sweep this evidence of fabrication under the rug, the FAC blithely asserts that "[i]n the original complaint Plaintiff's counsel erroneously attached an unrelated document."   (FAC ¶ 22.)

The FAC attaches yet another SWIFT message as purported documentary evidence of the €3 billion transaction, which introduces additional unexplained inconsistencies.   Exhibit 6 appears to discuss a transaction between Hestiun and NRG Co., albeit with a different reference number, but it describes an "issue date" of "03 FEB 2016," (*id.*), which does not match the October 7, 2015 date in Exhibit 5.   Exhibit 6 also lists Hestiun's Deutsche Bank account number as "███9464," whereas Exhibit 5 lists Hestiun's Deutsche Bank account number as "███9564."   (*Compare* FAC Ex. 5 *with* Ex. 6.)   The text of the FAC uses the first of these account numbers, but never explains why a different number appears on Exhibit 5.   (FAC ¶ 23.) In a remarkable coincidence and compounding the confusion, the Hestiun account number that appears on Exhibit 5 is associated elsewhere in the documents with Maybrook, not Hestiun.

9

(*See* FAC Ex. 9 at 3, 12; Ex. 12 at 1.)

The FAC cites Exhibits 9 and 12 to document the alleged €5 billion wire transfer from Maybrook to Plaintiff.   (*Id.* ¶¶ 32, 38.)   Exhibit 9 yet again uses the exact same Reference Number and Transaction ID as the alleged €3 billion transaction: "DEUT997856743216" and "090512DEUTDEFFXXX886479," respectively.   (FAC. Ex. 9 at 13.)[5]

Moreover, none of the three documents relied on by Plaintiff in the FAC or Complaint as proof of the transactions use a UTR that could possibly be genuine, as none includes any series of digits that could conceivably represent a date as required by the UTR system.   Had Plaintiff or Plaintiff's counsel been interested, they easily would have learned, based upon a search of sources publicly available on the internet, that a UTR includes a date reference that reflects the year in which the transaction took place, memorialized either in two or four digits—here, as "15" or "2015" for the first supposed transfer or "17" or "2017" for the second.   Not surprisingly, neither sequence appears in any of these bogus UTRs.[6]

Exhibit 9 also purports to include a message signed by Deutsche Bank's Chief Financial Officer ("CFO"), Dr. Marcus Schenck, and Chief Risk Officer ("CRO"), Stuart Lewis, but is on Maybrook letterhead.   (*Id.*)   Another purported message from Deutsche Bank's CFO and CRO, this time on what seems to be Deutsche Bank letterhead, is attached to the FAC as Exhibit 12.   It is purportedly addressed to Woori Bank's CEO.   The letter asserts that "records show that Woori Bank pulled the funds from Common Account ████01KR on March 8, 2017 but had not placed the funds into AJ Energy's account with Woori Bank."   (*Id.* ¶ 37.)   Notably, the

---

[5] The FAC's pagination for exhibits is inconsistent.   This page is found at Dkt. 19-2, p. 24.

[6] *See* Exhibits 7 through 10 to the Lichtman Declaration, which collects print-outs of four sample references from the internet, each of which reflect the method used to incorporate a transaction's date into a UTR.

signatures of the CFO and CRO on that "letter" bear no resemblance to the signatures on the first message.   (*Compare* FAC. Ex. 9 at 13 *with* Ex. 12 at 1.)

And Exhibit 9 to the FAC raises other bizarre issues.   For example, at the bottom of the first page, Maybrook represents that "DEUTSCHE BANK AG IS THE LAWFUL OWNER OF THE PROPOSED FUNDS," i.e., the five billion Euros to be transferred are declared to be property "owned" by Deutsche Bank and thus not owned by Maybrook, which is the supposed provider of these imaginary funds.

The FAC's other attachments also raise more questions than they answer.   Exhibit 9 includes what appears to be an email from Deutsche Bank's CFO to "Alexander@aj-energy.com" but which is addressed to an unidentified "Mr. Park" and "Mr. Lee."   (FAC Ex. 9 at 14.)   Exhibits 2, 3, and 11 are a series of incomprehensible documents naming inconsistent "providers," "receivers," and "beneficiaries" of multi-billion Euro deals, which include several scanned passport images appended for no apparent reason.   To take one example, Exhibit 3 is supposed to be the "Business Asset Agreement . . . between Hestiun and NRG," (FAC ¶ 19), but the document identifies a €3 billion transaction in August 2015 "TO THE 'COMMON ACCOUNT' IN DEUTSCHE BANK AG IN FAVOR OF AND FOR FURTHER BENEFIT OF WEHRHAHN GMBH."   (FAC Ex. 3 at 1.)   "Wehrhahn" is never again mentioned.

Any one of these inconsistencies alone should have provoked a reasonable pre-filing investigation.   Taken together, these unresolvable inconsistencies demonstrate, at best, a complete absence of any such investigation.

### D.    The Parties' Post-Filing Correspondence

Counsel for Woori Bank sent a letter to Plaintiff's counsel dated April 5, 2018, notifying Plaintiff that Deutsche Bank, in a submission to the court in the Korean Litigation, had formally denied the existence of any documentation confirming the alleged transfer of €3 billion as

alleged transaction.   (Lichtman Decl. Ex. 1.)   The letter also explained that Deutsche Bank's submission formally denied the existence of the "common account."   (*Id.*)   The letter provided a certified English translation of that submission for Plaintiff's reference.   (*Id.*)

On April 12, 2018, counsel for Woori Bank sent another letter to Plaintiff.   That letter attached authentic SWIFT messages from Deutsche Bank stating that it was "unable to locate any payment details with the given reference."   (Lichtman Decl. Ex. 2 at 2.)   Woori Bank also pointed out several of the more glaring inconsistencies apparent on the face of the Plaintiff's documentation, including that the two alleged wire transfers purportedly have the same Unique Transaction Reference number; that the documentation in support of the alleged €3 billion transfer lists incorrect and inconsistent beneficiaries; and that the two purported signatures of Deutsche Bank's CFO did not match.   (*Id.* at 2-3.)   Incredibly, Plaintiff apparently did nothing in response, despite being confronted with these issues.

### E.     Deutsche Bank's Testimony

In light of Plaintiff's failure to withdraw the Complaint, Woori Bank sought additional confirmation from Deutsche Bank.   Woori Bank supplied Deutsche Bank with a copy of the Complaint and its exhibits so that Deutsche Bank could provide its testimony as to whether the two alleged wire transfers actually occurred.   (Kaba Aff. ¶¶ 1-2.)   Deutsche Bank's Assistant Vice President Mohamed Kaba "reviewed the Complaint and the attachments thereto, and … searched the records of Deutsche Bank concerning the existence of the transactions alleged in the Complaint."   (*Id.* ¶ 2.)   Mr. Kaba was "authorized by Deutsche Bank to make [his] affidavit," which is dated May 3, 2018 and explains the results of his search.   (*Id.* ¶ 1.)

The affidavit confirms that Deutsche Bank "did not execute" either of the alleged wire transfers, and has "not identified any record of" those transactions as a result of Mr. Kaba's search.   (*Id.* ¶¶ 8-9.)   The Deutsche Bank affidavit further explains that Deutsche Bank did not

execute the transactions reflected in the SWIFT messages attached as Exhibits 1, 2, and 3 to the Complaint. (*Id.* ¶¶ 3-4, 6-7.) "Additionally, the signatures purporting to be the signatures of Dr. Marcus Schenk or Mr. Stuart Lewis do not appear to be authentic." (*Id.* ¶ 3; *see also id.* ¶ 5.) And, "Deutsche Bank did not send the letter attached as Exhibit 3 to the Complaint and the letter purporting to be from Deutsche Bank does not appear to be authentic." (*Id.* ¶ 5.) Finally, "Deutsche Bank has not identified any record of a common account number matching the one referenced in paragraph 39 of the Complaint," *i.e.* the "common account" from which Woori allegedly stole Plaintiff's funds. (*Id.* ¶ 10.) This affidavit leaves no doubt that the transactions are fabrications and that Plaintiff is relying on forged documents in what can only be considered as an effort to mislead this Court.

Woori Bank sent the affidavit to Plaintiff's counsel on May 4, 2018 with a cover letter again urging Plaintiff to dismiss this case. (Dkt. 11.) Rather than dismiss the Complaint, Plaintiff's counsel doubled down, and relied upon an apparently forged letter purporting to be from Deutsche Bank's CEO, which Plaintiff says shows that Mr. Kaba "is not authorized to verify any matters regarding the case against AJ Energy LLC and Woori Bank." (Lichtman Decl. Ex. 3.) Plaintiff proceeded to file the FAC, which reasserts the false transactions and re-attaches the highly dubious letters purporting to be from Deutsche Bank.

## III. ARGUMENT

### A.   Rule 11(b) Applies to the FAC

Under Rule 11(b), the presentation of a complaint in federal court certifies, among other things, that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," and that the complaint "is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P.

11(b)(1), (b)(3).   The presentation further represents that the certification is "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances."   Fed. R. Civ. P. 11(b).   These certifications are triggered "[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it."   *Id.*

**B.**      **Sanctions Are Appropriate Because the FAC Violates Rule 11(b)**

"If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."   Fed. R. Civ. P. 11(c)(1).   The Rule 11 standard is one of "objective unreasonableness."   *Margo v. Weiss*, 213 F.3d 55, 65 (2d Cir. 2000).   Thus, sanctions are warranted regardless of whether the plaintiff sued in good faith. *See In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 712 F. Supp. 2d 255, 266 (S.D.N.Y. 2010) ("Rule 11 . . .   forbids counsel from asserting an 'empty-head-but-pure-heart defense' as justification for frivolous legal or factual claims.").   Where even *one* claim among many is objectively unreasonable, Rule 11 permits sanctions.   *See Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 504 (2d Cir. 1989) ("[T]o adopt a standard that would deny sanctions for a significant and obviously meritless claim simply because the rest of the pleading was sound strikes us as contrary to this court's established reading of Rule 11.").

Here, the FAC violates Rule 11(b) in at least three ways (all of which were also true of the initial Complaint).   First, the FAC's false factual allegations have no evidentiary support and are never likely to have any evidentiary support.   Fed. R. Civ. P. 11(b)(3).   Second, there could not have been any reasonable investigation conducted before filing.   *Id.*   Third, the FAC was brought for an improper purpose.   Fed. R. Civ. P. 11(b)(1).

1.   <u>**Plaintiff's Claims Lack Any Reasonable Evidentiary Support**</u>

"Rule 11 is designed to insure that allegations made in a complaint drafted by a member of the bar of this Court are supported by a sufficient factual predicate *at the time that the claims are asserted*."   *City of Yonkers v. Otis Elevator Co.*, 106 F.R.D. 524, 525 (S.D.N.Y. 1985); *see also Abner Realty, Inc. v. Adm'r of Gen. Servs. Admin.*, 1998 WL 410958, at *4 (S.D.N.Y. July 22, 1998) ("The substantive requirement imposed on an attorney or party by Rule 11 is that [p]leadings, motions, and other papers be justifiable at the time they are signed.   It follows, then, that a court must neither allow hindsight to skew judgment nor countenance belated rationalizations concocted to conceal chicanery.") (citation and internal quotation marks omitted).   "In considering sanctions regarding a factual claim, the initial focus of the district court should be on whether an objectively reasonable evidentiary basis for the claim was demonstrated."   *Saltz v. City of New York*, 129 F. Supp. 2d 642, 646 (S.D.N.Y. 2001) (quoting *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1329 (2d Cir. 1995)); *see also Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *13 (S.D.N.Y. Sept. 24, 2008) ("[P]laintiffs must have an adequate, non-frivolous basis in fact for their claims."), *aff'd*, 356 F. App'x 535 (2d Cir. 2009).

"It is clear that sanctions are appropriate where facts have been 'concocted.'"   *Id.*; *see also Levine v. FDIC*, 2 F.3d 476, 479 (2d Cir. 1993) (holding that "[t]he creativity of an attorney may not transcend the facts of a given case; counsel in his attempts at creativity concocted 'facts' that were not well grounded, and therefore exceeded the bounds of conduct acceptable of members of the bar of this court as well as those incorporated in Fed. R. Civ. P. 11.") (alteration in original).   In applying Rule 11(b), the Court may also consider whether the baseless allegations concern a "collateral or trivial fact" or "a material allegation central to the viability of the entire pleading."   *Austl. & N.Z. Banking Grp.*, 712 F. Supp. 2d at 264.

Here, the FAC's central allegations that--€8 billion were transferred at all--lack any objectively reasonable evidentiary basis and are completely concocted.   *First*, Plaintiff alleges that "Hestiun agreed to transfer €3 Billion to the common account," and "[t]he funds were transferred from Deutsche Bank's common account to Woori Bank."   (FAC ¶¶ 21-22.)   There is no objectively reasonable evidence that the alleged €3 billion wire transfer ever happened, nor will discovery reveal any such evidence.   Deutsche Bank, through its affiant, has testified that it "did not execute the transaction purportedly referenced in paragraphs 14 through 17 of the Complaint," *i.e.*, the €3 billion transaction re-alleged in the FAC.   (Kaba Aff. ¶ 8.)   Indeed, Deutsche Bank "has not identified any record of the transaction referenced in paragraphs 14 through 17 of the Complaint."   (*Id.*)   Not surprisingly, Woori Bank also has no record of any such transaction because it did not occur.   (Park Decl. ¶ 3.)

*Second*, the FAC alleges that "[o]n February 13, 2017," "€5 Billion were to be transferred from Maybrook's account at Deutsche Bank to Woori Bank's common account with Deutsche Bank" and allegedly were so transferred.   (FAC ¶¶ 40, 42.)   However, Plaintiff proffers no objectively reasonable evidence that the alleged €5 billion wire transfer ever happened, nor can discovery reveal any such evidence.   As a threshold matter, Deutsche Bank testified that it "did not execute the transactions purportedly referenced in paragraphs 31 through 35 of the Complaint," *i.e.*, the €5 billion transaction re-alleged in the FAC.   (Kaba Aff. ¶ 9.)   And Deutsche Bank "has not identified any record of the transaction referenced in paragraphs 31 through 35 of the Complaint."   (*Id.*)   Again, Woori Bank also has no record of any such transaction because it did not occur.   (Park Decl. ¶ 4.)[7]

---

[7] Because there is no credible evidence to support the alleged transactions, the FAC's allegations that Woori Bank's CEO was the "instigator of the theft" also violate Rule 11(b).

*Third*, both purported wire transfers allegedly involved depositing funds in a "common account" held by Woori Bank and Deutsche Bank.   (FAC ¶¶ 17, 22, 40.)   The FAC identifies that "common account" as "number ███████01KR."   (*Id.* ¶ 24.)   But "Deutsche Bank has not identified any record of a common account number matching the one referenced in paragraph 39 of the Complaint," *i.e.*, account number ███████01KR.   (Kaba Aff. ¶ 10; *see* Dkt. 1-1 ¶ 39.) There is therefore no objectively reasonable evidence that the common account exists, nor is it possible that discovery could reveal any such evidence.

*Finally*, the "evidence" attached to the FAC purporting to demonstrate the two alleged wire transfers to Woori Bank's common account is also not objectively reasonable.   In the first place, Deutsche Bank has reviewed all three exhibits to the Complaint, including the alleged SWIFT messages, and has testified that it did not execute the transactions reflected in them. (Kaba Aff. ¶¶ 3-7.)   These unexplained and inconsistent allegations, along with each of the other serious factual inconsistencies raised above, further support the conclusion that the documents are concoctions, filed in violation of Rule 11(b).

Deutsche Bank's testimony and the dubious documents attached to the Complaint and the FAC show that Plaintiff's allegations have "no basis in fact, [and] were clearly in violation of Rule 11."   *Otis*, 106 F.R.D. at 525.   These concocted allegations are not "collateral," but are "central to the viability of the entire pleading," as they go right to the heart of the two alleged transactions on which the entire FAC is based.   *Austl. & N.Z. Banking Grp.*, 712 F. Supp. 2d at 264 (awarding sanctions where complaint alleged emails central to scienter theory, but "the March 2007 emails simply did not exist").   Thus, filing the FAC that relies on these concocted facts and documents "exceeded the bounds of conduct … incorporated in Fed. R. Civ. P. 11." *Levine*, 2 F.3d at 479; *accord Colliton*, 2008 WL 4386764, at \*14 ("In sum, given the dubious

and contradictory factual allegations in the complaint, Rule 11 sanctions are appropriate.").

### 2.      No Reasonable Investigation Was Conducted

Rule 11 "imposes an 'affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed.'"  *Galin v. Hamada*, 283 F. Supp. 3d 189, 201 (S.D.N.Y. 2017) (Furman, J.) (quoting *Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998)); *see also Abner Realty*, 1998 WL 410958, at *3 ("Simply put, an attorney must 'stop, look and listen' before signing a document subject to Rule 11.").

Although "[a]n attorney is entitled to rely on the objectively reasonable representations of the client," sanctions cannot be avoided merely because a client vouched for the facts asserted in the pleading.  *Saltz*, 129 F. Supp. 2d at 646 (quoting *Hadges*, 48 F.3d at 1329-30).   Rather, "[w]hen an attorney must rely on his client, he should question him thoroughly, not accepting his version on faith alone."  *Id.* (alteration in original) (quoting *Nassau-Suffolk Ice Cream, Inc. v. Integrated Res., Inc.*, 114 F.R.D. 684, 689 (S.D.N.Y. 1987)).   "[I]f all the attorney has is his client's assurance that facts exist or do not exist, when a reasonable inquiry would reveal otherwise, he has not satisfied his [Rule 11] obligation."  *Id.* (alterations in original) (citation omitted); *see also Catton v. Def. Tech. Sys. Inc.*, 541 F. App'x 25, 27-28 (2d Cir. 2013) (affirming sanctions and holding that plaintiff's attorneys should have investigated plaintiff's claims before filing amended complaints because witness testimony was "objectively unreasonable"); *Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1327 (S.D. Fla. Mar. 23, 2007) (imposing sanctions on attorney where attorney relied "simply[] and solely" on the word of his client when filing an affidavit based on fabricated facts).   Moreover, "where an attorney can get the information necessary to certify the validity of a claim in a public fashion and need not rely solely on his client, he must do so."  *Abner Realty*, 1998 410958, at *4.

In particular, when the client's story is far-fetched, or contains odd and incongruous facts,

those "red flags" should alert the attorney to investigate.   In *Saltz*, the sanctioned attorney

accepted his client's representation that he had been assaulted by police officers who were

driving "an unmarked unidentified van with an oval shaped plate of foreign origin," and a license

number containing "A255."   129 F. Supp. 2d at 645.   The Court found that the attorney "did not

make a reasonable inquiry into the facts alleged in plaintiff's complaint" because he "did not

make any effort to determine whether his client's description of the van license plate …

comported with reasonable descriptions of police van license plates, despite the fact that his

client described an 'oval shaped plate of foreign origin.'"   *Id.* at 646.   Counsel also made only

"modest efforts to request the police motor pool records," to attempt to confirm the partial plate

number supplied by his client.   *Id.*   The court sanctioned this failure to investigate.   *See id.*

In *Abner Realty*, plaintiff and its counsel wrongfully named a defendant in the complaint

and continued to prosecute claims against that defendant, despite defendant's notice to plaintiff

and its counsel that the factual predicate for the allegations was false and plaintiff's counsel

should have been able to discover this information through public access.   The court then held

that plaintiff and its counsel violated Rule 11 and imposed monetary sanctions on both plaintiff

and its counsel, ordering them to pay defendant's legal fees and provide letters of apology to

defendant.   1998 WL 410958, at *4-8.

Here, too, the red flags in the documents attached to the Complaint and FAC should have

prompted Plaintiff's counsel to investigate further before filing, in particular because Plaintiff's

counsel could verify Plaintiff's allegations through publicly available sources and common

sense.[8]   Much like an NYPD van with an oval-shaped license plate, three transactions (only two

---

[8]  Based on the abundance of "red flags" presented here and the clear precedent cited above that
an attorney cannot rely upon a client's assertion of facts that flies in the face of circumstances

of which allegedly relate to Woori Bank) occurring in different years with identical Reference Numbers and Transaction IDs are inherently suspect.   The documents attached to both versions of the Complaint that identify varying and inconsistent transaction dates and beneficiaries likewise should have prompted further investigation.   The same is true of the non-matching signatures on Exhibits 9 and 12 to the FAC.   (*Compare* FAC Ex. 9 at 13 *with* Ex. 12 at 1.)

Moreover, the UTRs themselves evidenced the documents' corrupted provenance by not including any characters that reflect the year in which the transactions supposedly occurred. This particular attribute of UTRs—which was explained in various internet sources—not only dooms any potential, residual credibility that the documents might have had, but also demonstrates the lack of reasonable investigation of these fabricated documents. Plaintiff's counsel could have searched online for the meaning of the numbers listed in the UTRs of the purported transaction documents and realized that it is impossible for two or three different transactions to have the same UTR and not to have any digits reflecting the year of the alleged transactions.   *See Abner Realty*, 1998 WL 410958, at *4-5.

And, at the end of the day, a client's allegation that it transferred an additional €5 billion after the first €3 billion went missing fails to pass the straight face test, to say nothing of the lack of a reasonable explanation as to where that client obtained access to those sums.[9]

Under the circumstances, and given the inherently dubious documents, "any reasonable

---

that refute or undercut those assertions, the Affidavit of Alexander Bobarykin, dated June 21, 2018 and submitted by Plaintiff in opposition to Woori Bank's Motion to Dismiss the Complaint (Dkt. 31-1), is woefully inadequate to suffice as a reasonable inquiry into the legitimacy of factual allegations in the FAC.

[9] Unlike the Complaint, the FAC alleges that "[t]hese kinds of transactions are not uncommon for AJ Energy."   (FAC ¶ 29.)   The "evidence" for this vague assertion is Exhibit 8 to the FAC, which is just a list of purported offshore accounts, without any balance or transaction information or any indicia of its source and meaning.

inquiry into the factual basis of the pleading would have prevented" this case from going forward at all.   *See Austl. & N.Z. Banking Grp.*, 712 F. Supp. 2d at 264.   This failure to investigate violates Rule 11(b).

### 3.      Plaintiff's FAC Was Brought for an Improper Purpose

Rule 11 also forbids a plaintiff from presenting a complaint for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase in the cost of litigation.   *See Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995).   Plaintiff's FAC strategically fails to reveal that two other lawsuits were filed—one for each alleged wire transfer.   Plaintiff's decision to present the FAC here, despite those two previous lawsuits and without revealing their existence, is harassing, contributes to delay, and increases the cost of litigation for Woori Bank.

Plaintiff and its business partners have hauled Woori Bank into various courts across the country and the globe[10]—and prolonged the "dispute" by dismissing the California case without prejudice—in an apparent attempt to intimidate Woori Bank into paying a settlement or at least create such a nuisance that a payment looks like a reasonable option.   Plaintiff should be sanctioned to halt this pattern of harassment on the back of fabricated transactions and forged

---

[10] The Korean Litigation involves Plaintiff's alleged "Korean partner, NRG CO, LTD." (FAC ¶ 12), the purported beneficiary of the €3 billion wire transfer (if one ignores the contrary exhibits discussed above).   In May of 2017, NRG Co. brought a lawsuit in South Korea against Woori Bank, seeking compensation for the alleged €3 billion transaction.   (Park Decl. ¶ 7.)   In May 2018, the Seoul Central District Court issued an order dismissing NRG Co.'s complaint due to insufficient evidence to conclude that Woori Bank received the €3 billion wire.   (*Id.* ¶ 8, Ex. 1.)   The allegations in this lawsuit about the alleged €3 billion transaction needlessly increase the cost of litigation by seeking to litigate that transaction in two fora, especially against the backdrop of potential defenses of *res judicata* or collateral estoppel in light of the dismissal of the Korean Litigation brought by a "partner" of Plaintiff.

The California Litigation was brought by Plaintiff itself.   The California complaint makes allegations that are substantially similar to those in the FAC here regarding the alleged €5 billion transaction.   (Lichtman Decl. Ex. 6.)   On February 13, 2018, Plaintiff unilaterally dismissed the California lawsuit, after "inform[ing] the court that settlement discussions are ongoing."   (Lichtman Decl. Exs. 4, 5.)

documents.   *See Morley*, 66 F.3d at 24 (affirming sanctions where the "supplemental complaint filed by the plaintiff postponed this limited trial and was clearly an attempt to intimidate the defendant into a large settlement").

C.      **Plaintiff's Unreasonable Failure to Withdraw This Lawsuit Is Also Sanctionable**

Even where a complaint complies with Rule 11 when filed, if it is later learned "that their allegations on the central (and dispositive) issue in the case were 'utterly lacking in support,'" the failure to withdraw the pleading is sanctionable.   *Galin*, 283 F. Supp. 3d at 203 (quoting *StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 307 (2d Cir. 2014)).   A failure to withdraw such a complaint despite warnings from the defendant takes "their actions outside the ambit of 'zealous advocacy' and into the realm of Rule 11 sanctions."   *Id.*; *accord Otis*, 106 F.R.D. at 525 ("[P]laintiffs were afforded an ample opportunity to withdraw those allegations and unjustifiably refused to do so."); *Landmark Ventures*, *Inc. v. Cohen*, 2014 WL 6784397, at *5 (S.D.N.Y. Nov. 26, 2014) (sanctioning plaintiff where "defendants repeatedly put Landmark on notice that its claims against them were barred by contract and by the doctrine of arbitral immunity").

Here, even if the Court were to find that any aspect of this lawsuit complied with Rule 11(b) when it was initially filed—which it did not—the unreasonable refusal to dismiss this case—and decision to affirmatively file the FAC, re-attaching obviously false documents—after Defendants demonstrated the initial Complaint's allegations are false warrants sanctions.   In a letter dated April 5, 2018, counsel for Woori America notified Plaintiff that Deutsche Bank, in a submission to the court in the Korean Litigation, had formally denied the existence of any documentation confirming the alleged transfer of €3 billion as alleged transaction.   (Lichtman Decl. Ex. 1.)   The letter also explained that Deutsche Bank formally denied the existence of the "common account."   (*Id.*)

On April 12, 2018, counsel for Woori Bank again wrote to Plaintiff.   Despite the

numerous, significant defects raised in that letter, including the mismatched signatures and the repetitive, identical UTRs across different transaction (and each without date codes), Plaintiff still refused to withdraw the initial Complaint.   As also discussed above, counsel for Woori Bank went even further in its effort to dissuade Plaintiff from pursuing this baseless litigation in obtaining further proof from Deutsche Bank to settle the question of whether the two wire transfers occurred.   Defendants sent the Affidavit to Plaintiff with a cover letter again urging Plaintiff to dismiss this case.   (Dkt. 11.)   Despite this sworn testimony from a third party, Plaintiff persists in litigating the false allegations, and doubled down by filing the FAC.   The decision by Plaintiff and its counsel not to drop this case despite repeated warnings that it contains falsehoods takes "their actions outside the ambit of 'zealous advocacy' and into the realm of Rule 11 sanctions."   *Galin*, 283 F. Supp. 3d at 203.

**D.   The Court Should Dismiss the FAC with Prejudice and Award Attorneys' Fees and Costs**

Once a Rule 11 violation is shown, the Court "has available a variety of possible sanctions to impose," and the selection of an appropriate sanction is "committed to the discretion of the trial court."   Fed. R. Civ. P. 11(b), (c) advisory committee's note to 1993 amendment; *Charles v. Levitt*, 2016 WL 3982514, at *6 (S.D.N.Y. July 21, 2016) ("A court fashioning a deterrent sanction has 'broad discretion' to 'tailor[ ] appropriate and reasonable sanctions. ...' 'Where a district court concludes that a monetary award is appropriate, its broad discretion extends to determining the amount of the award' and 'including an award of attorney's fees where warranted.' (internal quotation marks and citation omitted), *aff'd*, 716 F. App'x 18 (2d Cir. 2017).   Here, the Court should order the FAC dismissed with prejudice and award attorneys' fees and costs to Defendants for the amounts expended to prepare their Rule 12(b)(6) motions and this Motion.

1.      **The Court Should Dismiss the FAC with Prejudice**

Dismissal of the FAC *with prejudice* is appropriate even if the Court is otherwise

prepared to dismiss the case for failure to state a claim.   *Colliton*, 2008 WL 4386764, at \*15

("One appropriate sanction is the dismissal of [Plaintiff's] Amended Complaint with prejudice.

Although the Court has already decided to dismiss the Amended Complaint for failure to state a

claim, this sanction under Rule 11 serves as an alternative ground for dismissal."); *Abdelhamid v.

Altria Grp., Inc.*, 515 F. Supp. 2d 384, 400 (S.D.N.Y. 2007) (the "appropriate sanction is the

dismissal of [Plaintiff's] Amended Complaint," even though the court had already decided to

dismiss the complaint for failure to state a claim.   The FAC is based on demonstrably false

factual assertions, and no amendment could cure the non-existence of the alleged transactions.

Moreover, dismissal with prejudice will result in a final order that can prevent future

fraudulent lawsuits.   *See Samuels v. N. Telecom, Inc.*, 942 F.2d 834, 836 (2d Cir. 1991) ("A

dismissal with prejudice has the effect of a final adjudication on the merits favorable to

defendant and bars future suits brought by plaintiff upon the same cause of action.").   Plaintiff

has already brought two other lawsuits that overlap with the FAC, demonstrating its willingness

to keep shopping for a forum that will consider its false allegations.   A dismissal with prejudice

will help dissuade Plaintiff from filing yet another complaint in another jurisdiction.

2.      **The Court Should Award Attorneys' Fees and Costs**

In addition to dismissal, attorneys' fees may be awarded where "deterrence may be

ineffective unless the sanction . . . directs that some or all of [the] payment be made to those

injured by the violation."   *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 661

(S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997).   Such fees should include the amounts

expended by Woori Bank to prepare its defense of this action, including its Rule 12(b)(6)

motions and this Rule 11 Motion, including any reply briefing.   *See Gold v. Fields*, 1993 WL

24

212672, at *8 (S.D.N.Y. June 14, 1993) (imposing Rule 11 sanctions "in an amount equal to the reasonable attorney's fees and expenses that defendants incurred in pursuing the motion to dismiss . . . and in pursuing this motion"); *Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG*, 2005 WL 3099592, at *7 (S.D.N.Y. Nov. 17, 2005) ("A reasonably accurate measure of the harm [the plaintiff] has done is what he has cost his opponent.") (alteration in original) (citation omitted).

Plaintiff has demonstrated that deterrence will be ineffective unless the sanction includes a monetary payment.   Plaintiff and its alleged partners have filed serial lawsuits containing false allegations and have refused to drop this case despite ample and repeated notice of the falsity. Deterrence is best achieved by ordering Plaintiff to pay Defendants' fees and costs incurred to file their Rule 12(b)(6) motions and this Rule 11 Motion, none of which would have been necessary but for Plaintiff's improper pleading.   In addition, the Court should impose such additional punitive sanctions as it determines appropriate given the egregious facts presented.

## IV.  CONCLUSION

For the foregoing reasons, Woori Bank's Motion for Sanctions against Plaintiff should be granted, and the FAC should be dismissed with prejudice.   The Court should further order Woori Bank to submit a bill of fees and costs reflecting the sums expended to prepare their Rule 12(b)(6) motions and this Motion, including any reply briefing, and order Plaintiff to reimburse those fees and costs and pay such additional punitive sanctions as the Court deems appropriate.

Dated: July 10, 2018                     /s/*Jeffrey S. Lichtman*
     New York, New York              Jeffrey S. Lichtman
                                      O'HARE PARNAGIAN LLP
                                      82 Wall Street, Suite 300
                                      New York, New York 10005
                                      Tel: (212) 425-1401
                                      jlichtman@ohareparnagian.com

                                      *Co-Counsel for Woori Bank*