UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT IN NEW YORK

_____

| | | |
|---|---|---|
| AJ Energy LLC, | ) | Case No. 18-cv-03735 (JMF) |
| | ) | |
| | ) | |
| Plaintiff, | ) | **ORAL ARGUMENT** |
| v. | ) | **REQUESTED** |
| | ) | |
| WOORI AMERICA BANK, WOORI BANK and | ) | |
| | ) | |
| Does 1 through 1-50, inclusive | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

_____


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SANCTIONS AND AJ ENERGY'S MOTION FOR SANCTIONS**


THE LAW OFFICE OF RUTH CAM
RUTH CAM, ESQ. ATTORNEY AT LAW
2030 E. 4th Street, Suite 218A
Santa Ana, CA 92705
Tel: 714-488-9934
Fax: 844-272-6631


*Counsel for AJ Energy, LLC*


0

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ......................................................................................1

II.  BACKGROUND ......................................................................................6

III. DEFENDANT'S ARGUMENTS ......................................................7

IV. DEFENDANT'S ALLEGATIONS THAT PLAINTIFF'S DOCUMENTS SHOW INDICIA OF FRAUD.............................................................................................................................12

V. POST-FILING CORRESPONDANCE......................................................................15

VI. DEUTSCHE BANK'S ALLEGED TESTIMONY....................................................16

VII. ARGUMENT WITH POINTS AND AUTHORITY................................................18

1.      Argument..............................................................................20

2.      Argument..............................................................................24

3.      Argument..............................................................................25

4.      Argument..............................................................................26

5.      Argument..............................................................................28

6.      Argument.............................................................................28

7.      Argument ….......…...........................................................................29

VIII.CONCLUSION.   ……………………………………………….………....29

# TABLE OF AUTHORITIES Page(s)

## CASES

*City of Perry, Iowa v. Proctor and Gamble Co*,
  2017 WL 2656250, at 2 (S.D.N.Y.) June 20, 2017.......................................18

*Rodick v. City of Schenectady*,
  1 F.3d 1341, 1350 (2d Cir.1993).................................................................18,23

*Mercury Air Grp. v. Mansour*,
  237 F.3d 542, 548, (5th Cir.2001)...................................................................19

*Margo v. Weiss.*,
  213 F.3d 55 (2d Cir.2000)...............................................................................20

*City of Yonkers v. Otis Elevator Co*,
  106 F.R.D. 524-525 (S.D.N.Y 1985)...............................................................20

*Luv N'Care, Ltd. v. Shiboleth*,
  LLP, 2017 WL 3671039, at *13 (S.D.N.W. Aug. 8, 2017)............................20

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*,
  579 F.3d 143, 150, (2d. Cir. 2009)................................................................. 21

*Austl. & N.Z. Banking Grp.*,
  712 F. Supp. 2d at 264 (XXXX 20XX).............................................................23

*Oliveri v. Thompson.*,
  803 F.2d 1265, 1275 (2d Cir. 1986)................................................................23

*Rodick v. City of Schenectady*,
  1 F.3d 1341, 1350 (2d Cir.1993)....................................................................23

Four *Keys Leasing & Maint. Corp. v. Simithis*,
  849 F.2d 770, 773 (2d Cir. 1988)...................................................................24

*Healey v. Chelsea Res Ltd*,
  947 F.2d 611, 626 (2d Cir. 1991) ..................................................................24

*Galin v Hamada*,
  283 F. Supp. 3d at 203 189 (S.D.N.Y 2017) .................................................27

Cooter & Gell v. Hartmarx Corp.,
  496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)..........................27

*Browning Debenture Holders' Comm v. DASA Corp.,*
  560 F.2d 1078, 1088 (2d Cir.1977)................................................................27

*Abdelhamid v. Altria Grp., Inc.,*
515 F. Supp. 2d384,400 (S.D.N.Y. 2007)............................................................................28

*Katzman v. Victoria's Secret Catalogue.,*
    167 F.D.R. 649,661 (S.D.N.Y. 1996) *aff'd*, 113 F.3d 1229 (2d Cir. 1997)…………...29

*Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG.,*
    2005 WL 3099592, at *7 (S.D.N.Y. Nov. 17, 2005)......................................................29

Plaintiff AJ Energy, LLC (hereinafter AJ Energy) respectfully submits this Opposition to Woori Bank's Motion for Sanctions and its own Motion for Sanctions against Woori Bank and its attorneys.


## I. PRELIMINARY STATEMENT

Defendant Motion is filed with the goal to confuse the issues and parties, and mainly to prevent Plaintiff from commencing discovery just as they did in South Korea. New York is the **only** forum where Plaintiff has a chance for a fair trial, as the South Korean Government's influence does not reach into US Federal Courts. Woori Bank and its counsel are well aware that their defense will collapse as soon as Plaintiff is permitted to begin discovery. First and foremost, our case filed in New York is about two transactions made by **Deutsche Bank AG, in Frankfurt Germany.** Neither Deutsche Bank, New York, or Deutsche Bank, Seoul, nor any other subsidiaries around the world, have access or knowledge of these transactions. Using affidavits from either subsidiary is simply meaningless. It is clearly a tactic Defendant uses to cause confusion. In its motion for Sanctions, Defendant intentionally identifies Deutsche Bank, New York as Deutsche Bank AG, without even identifying that their affidavits come from Deutsche Bank, New York and not from Deutsche Bank AG, Frankfurt, Germany. Why did opposing counsel not approach Deutsche Bank AG, Frankfurt? Clearly the only reason would be to mislead and confuse the issues. Plaintiff has provided multiple documents by Deutsche Bank AG Officials from Frankfurt, Germany, and claiming they are fraudulent is not only wrong, but baseless. Plaintiff will provide more detailed statements, declarations and depositions from Deutsche Bank AG, Frankfurt during discovery. Woori Bank is well aware Deutsche Bank AG, Frankfurt is the only entity that can make these statements about the transactions at issue, and therefore is trying to do anything it can to prevent

1

discovery from even starting. Plaintiff will be able to subpoena other organizations as well who have proof of the fact that both the transactions are real and happened exactly as Plaintiff alleges.

Further, Defendant's accusations of forum shopping are simple not true. A lawsuit was filed in South Korea regarding the €3 Billion, but the judge on the case was simply told by a faction in the South Korean government to ignore any evidence provided by Plaintiff. (See Exhibit 16) In order to explain why South Korea is not only an impossible but also dangerous forum, Plaintiff needs to disclose some background information. Information has been given to us through our South Korean witnesses, who will be able to testify as to the use of the stolen funds. It was well known that Lee-Kwan-goo, the suspected initiator of the theft, had close ties to the Park administration in South Korea. Lee Kwang-goo is known for his role as de facto banker to former President Park Geun-hae. Almost two years passed since the first €3 billion went missing (Oct. 2015). NRG did not take any legal actions against Woori Bank because of the extraordinary circumstances surrounding the Park Administration. Under surveillance, NRG principals even faced death threats and the like during this period. As a result, NRG waited until Park's impeachment.[1] NRG filed a civil complaint a day after Moon's election.[2] During the interim (two months between post-impeachment and Moon's election), NRG communicated with senior officials from the Ministry of Strategy and Finance, who ensured Plaintiff the safety of future incoming funds and discussed use of funds.[3] Plaintiff erroneously believed that Moon's election signaled a

---

[1] On December 9, 2016, Park was impeached by the National Assembly with the Constitutional Court upholding the impeachment on March 10, 2017.
[2] Moon's election fell on May 9 2017 and NRG's civil case was filed on May 10, 2017. Park's administration worked to resolve the €3 billion case. NRG received documents from officials from the Blue House that support the claim that officials actively discussed resolution.
[3] Yoo Il-ho, the Deputy Prime Minister and Minister of Strategy and Finance (MOSF) and Choi Sang Mok, Deputy Minister of MOSF. Deputy Minister Choi's representatives arranged the opening of the offshore account at Woori Bank for AJ Energy. The funds were to be used for Daewoo Shipbuilding and Marine Engineering, Hanjin Shipping, government bonds and other government projects.

return to rule of law and normalcy, and directly reported to President Moon the crimes committed by Lee Kwang-goo and Woori Bank.

However as we later found out, part of the stolen €5 Billion was used to finance President Moon's presidential campaign. Therefore, the faction in the South Korean government which accepted the funds is fighting to keep quiet about this use of Plaintiff's funds, and at this point, Ministers and other South Korean government officials have been threatened with harm if they continue arguing about the rightful return of the funds to Plaintiff. During discovery, Plaintiff will be able to depose these third parties. We will also show during discovery that the South Korean government, especially Im Jong-seok, Chief Presidential Secretary and North Korea supporter, is currently holding power in the Moon Administration. The involvement of powerful factions in the South Korean government that are aware of the theft makes it impossible for Plaintiff to receive a fair trial in South Korea.

Despite many attempts from AJ Energy and Deutsche Bank AG, Frankfurt, Woori Bank again denied receiving any funds from Deutsche Bank AG, Frankfurt.[4]  Approximately one month after Moon's inauguration in May 2017, Lee Kwang-goo received a presidential citation for services to the financial industry.  The fact that a Park stalwart such as Lee Kwang-goo could overnight become a member of the Moon camp fueled suspicions that significant deals were made.

As for the Orange County lawsuit, Plaintiff received wrong and bad advice from its counsel. Plaintiff has personally experienced the same issue with its New York case. New York attorney Alexander Paykin was found to have had discussions and exchanged emails with opposing counsel.

---

[4] AJ Energy filed a complaint against Woori Bank and Woori America for the 5 billion Euro theft in the Superior Court of State of California for the County of Orange on Sept. 9, 2017.  Plaintiff's attorney at the time, was Daniel Park.  Lee Kwang-goo retained an attorney close to Mr. Park and following their communication, Mr. Park's attitude towards the case changed significantly and Park did what he could, to dissuade Plaintiff from serving Woori Bank and Woori Bank America.  AJ Energy has since cancelled the filing submitted by Mr. Park and discontinued its relationship with Mr. Park.

Plaintiff's lead counsel Ruth Cam was never cc'd on or informed about these communications. Alexander Paykin went so far as to promise opposing counsel the case would be dismissed by a certain date, and was therefore fired by Plaintiff, who is still requesting its file, which Alexander Paykin refuses to provide. In South Korea, our representatives were threatened, and all media outlets were warned not to report on the case. Plaintiff's representatives were threatened and Plaintiff Jimmy Kim, a member of both NRG and AJ Energy, as well as his father Robert Kim, CEO Kim received death threads and had to leave the country to ensure their safety. Charles Kim, Jimmy Kim's brother came to Korea to help with investigation and translation of documents relevant to Plaintiff's case here in New York. On Thursday, July 26, 2018 Plaintiff found out that Charles Kim had been killed in Seoul. The suspect has close connections with President Moon's Campaign Manager.

Jin Man Sun of Seoul Gangnam Police Station is the lead detective on the case. Charles Kim, as well as AJ Energy Member Jimmy Kim, (Charles' younger brother) are American citizens. Plaintiff's attorney immediately informed the FBI about the killing of an American citizen in South Korea. Plaintiff is disclosing this matter to make it very clear that South Korea is not only an inconvenient forum, but a forum where the lives of Plaintiff's members are in danger. Plaintiff sincerely hopes that Woori Bank does not make light of the situation in its typically sarcastic manner. Plaintiff would NEVER use the death of a person to advance its case. No one working Plaintiff's behalf in South Korea is safe at this time. As for Defendant's claim that Plaintiff's lawsuit in New York State Court is part of supposed forum-shopping is nonsensical, as it was actually **Defendant** who filed to move the case to this Federal Court in the Southern District of New York.

Further, Defendant repeatedly states that it is impossible for a company like AJ Energy to have access to funds in these high amounts and conduct business transaction as the ones in dispute in this here matter. First, it is none of Defendant's business how much money Plaintiff has or how it makes its money. Unless Defendant wants to allege that its income was earned unlawfully, laying the groundwork for an "unclean hands" defense, how and with whom Plaintiff conducts business with is irrelevant to this lawsuit.

Defendant's motion makes it very clear that Defendant's counsel either does not know or pretends to not understand how to read the financial documents attached as exhibits to plaintiff's FAC. Defendant is grasping at straws by alleging inconsistencies in its motion for sanctions. One must be able to understand these financial statements, as well as the differing time formats between the US and Germany. Plaintiff recommends that Defendant hire an expert who can explain the intricacies of these statements during discovery, but Plaintiff will make another attempt to explain the documents. The authenticity of Plaintiff's documents should be determined in discovery. However as it is Defendant's goal to prevent Plaintiff from commencing discovery, Plaintiff states that the documents are authentic. Defendant claims that UTR number DEUT997856743216 is identical on several documents, and claims baselessly that this proves the documents are fabricated and cannot be genuine. In fact, these UTR numbers are identical, because they are Deutsche Bank AG, Frankfurt's UTR unique transaction numbers and have to be identical, in dealings with Deutsche Bank AG, Frankfurt. This UTR specifically has been assigned to Deutsche Bank AG, Frankfurt. Curiously, in Korean Court, Defendants claimed that Common Account (aka correspondent account) W1024001KR did indeed exist, but allegedly was a Common Account between Woori Bank, Korea and Gazprombank, a Russian Bank. It is entirely possible, as the Common Account can be used by any bank for large international transactions (See Exhibit 1).

Now, Woori Bank falsely claims the account does not exist, even going as far as to submit an affidavit supporting the fraudulent claim that the account does not exist. (See Exhibit 2) Defendant's claim that the FAC contains lacks evidentiary basis, and therefore violates Rule 11, is not only baseless, it shows that Defendant intentionally and knowingly solicited a false affidavit by a Deutsche Bank, New York employee. (See Exhibit 2). Plaintiff agrees this lawsuit has real live effects. At least 30,000 new jobs were not able to be created in the South Korean Shipping industry, as Defendant stole the funds assigned to be invested in the ailing industry and recently the death of Charles Kim.

## II. Background

**A.** AJ Energy is a Nevada Limited Liability Company, with its main place of business in Newport Beach, California, County of Orange. It is an investment firm handling large transactions all over the world. Alex Bobarykin is the CEO of AJ Energy and also on the board of NRG, Ltd., a Korean-based company working in partnership with AJ Energy. Jimmy Kim, a member of NRG, is also a member of AJ Energy. Both conduct lawful business, and the details of their business are of no relevance to this case. Hestiun Finance was a United Kingdom Private Limited Company and affiliate of Deutsche Bank AG, Frankfurt. Hestiun had to close its business as a result of the €3 Billion theft and shut down in May 2016. Maybrook Financial Group Limited is also a United Kingdom Limited Company and also affiliated with Deutsche Bank AG, Frankfurt. They are NOT affiliated with either Deutsche Bank, New York or Deutsche Bank, Seoul. Defendants keep emphasizing that it is virtually impossible that these companies handle transactions of high monetary value and their business is not specified. A simple Google search would have shown that Maybrook Financial Group does these types of transactions. (See Exhibit 3) However, how and with whom these companies do business is also irrelevant to the case, and Plaintiff addresses the

issue only because Defendant is making these statements repeatedly to distract from the main matter, the theft of €8 Billion by Woori Bank. Simply repeating uninformed and false statements makes them neither true nor relevant.

Woori Bank is a Korean Company doing business around the world. It began its operation in the United States, State of New York on or around December 31, 2012. Defendant is questioning why Plaintiff alleges that Woori Bank is using AJ Energy's account with Woori Bank to launder money. Plaintiff included the issue, as it is part of Woori Bank's pattern of unlawful behavior. Plaintiff did not file a cause of action, as AJ Energy did not incur money damages caused Woori Bank's fraudulent business practices related to money laundering.

### III. DEFENDANT'S ARGUMENTS

Defendant again makes statements to be taken as facts and irrefutable evidence, when they have zero basis. It is well aware that the case in South Korea was not dismissed due to lack of evidence, but because the Court refused to even look at Plaintiff's evidence regarding the €3 Billion transaction. Then and now, Deutsche Bank AG, Frankfurt Officials are standing by, ready to be deposed and testify during discovery and if necessary during trial. Plaintiff's attorney is fluent in German and is set to meet with Deutsche Bank Officials during the next few weeks.

We have attempted to explain the types of transactions, Defendant baselessly claims never happened in the FAC, and we are attaching more detailed information. Defendant relies on Mohamed Kaba's Declarations, which are likely done as a favor, as Deutsche Bank, New York is a client of one of Defendant's attorneys. Neither Deutsche Bank, New York or Deutsche Bank, Seoul have any knowledge about Deutsche Bank AG, Frankfurt's transactions. Plaintiff once more wonders why Defendant did not contact Deutsche Bank AG, Frankfurt. Just as a McDonald's

7

franchise does not have knowledge about the business of other franchises, these are distinct and different transactions made by Deutsche Bank AG, Frankfurt. At most, Mohamed Kaba can declare that he has no knowledge of these transactions; he does not speak for Deutsche Bank AG, Frankfurt. Plaintiff is in the process of obtaining affidavits by Deutsche Bank AG, Frankfurt. Calling the affidavits by Mohamed Kaba irrefutable is not only false, but intentionally misleading. Further, Mohamed Kaba claims he is in the anti-financial crimes division of Deutsch Bank AG, conveniently omitting the fact that he works for Deutsch Bank, New York and not for Deutsche Bank AG, Frankfurt. A simple phone call to any Deutsche Bank in the US would confirm that they have no access to or knowledge of transactions by Deutsch Bank AG, Frankfurt.

Mohamed Kaba is also not a handwriting expert and can make no claim as to the authenticity of Deutsche Bank AG, Frankfurt CEO Christian Sewing's signature. This also is a matter to be resolved in discovery, when Defendant can hire a handwriting expert, while we are taking Mr. Sewing's deposition. Defendant's motions against Plaintiff are drafted with only one goal in mind: to prevent Plaintiff from reaching the discovery phase of this lawsuit. Defendant is well aware that once we are in discovery, its defense will fall apart, and uses every tool it has available to delay and/or prevent discovery in this matter from commencing. Further, as stated above in the South Korea Court Case, Woori Bank admitted that the common account (See Exhibit 1) exists and was used between Woori Bank and Gazprom Bank in Russia. The nature of common accounts makes this statement false. A common account is not one account with one other bank; it is used by many banks in different countries to make international transactions easier (See Exhibit 15). In spite of many documents to the contrary, Woori Bank now claims the account does not exist,. Defendant's claim that its evidence is "irrefutable" and Plaintiff's exhibits are all fraudulent has no merit, and both Defendant and the two firms representing Defendant are well aware of this

8

fact.

Mohamed Kaba also alleges in paragraph 16 of his affidavit that Deutsche Bank AG in ¶ 16, that Deutsche Bank [again leaving out New York] has not identified any record of the account number as related to Maybrook Financial Group. A simple Google search proves this statement false (See Exhibit 3) and therefore both affidavits should not be considered credible. Further, two simple phone calls to Deutsche Bank, New York, which were recorded on 07/31/2018, and 08/03/2018 by Charles André Ferreira, Consultant to AJ Energy, disproves that Deutsche Bank, New York has any access to transactions by Deutsche Bank AG, Frankfurt. (see transcripts and affidavit by Charles André Ferreira as Exhibit 4) Plaintiff is astonished that Defendant's attorneys would knowingly provide Mr. Kaba with a false affidavit for signature. Proof of the falsehood of this statement made intentionally under oath should render both affidavits invalid and not even in the same realm as being "irrefutable" evidence. Defendant's attorneys did not hesitate to suborn perjury to defend its case, and therefore sanctions are appropriate.

As for Yun Su Park, a General Manager of Woori Bank, she is a Defendant and would likely say or do anything to avoid evidence of Woori Bank's fraud ever being exposed. She obviously has the same goal as her employer: To do anything possible to prevent the allegations of fraud committed from reaching the discovery phase or allowing Plaintiff the of the opportunity to actually prove his allegations in a fair trial. Plaintiff is also working with US government officials who are determined to bring the truth to light. Plaintiff has similar accounts with other Korean Banks that contain funds that also were supposed to be invested in the South Korean economy

AJ Energy was working closely with Yoo Il-ho, Deputy Prime Minister of South Korea and also Minister of Strategy and Finance (MOSF), and Choi Sang Mok, Deputy Minister of MOSF. These two government officials arranged the opening of AJ Energy with Woori Bank. To this day,

9

AJ Energy still has funds slated for investment that are sitting in Korean accounts. Of course, these funds will never be invested as long as Im Jong-seok and his faction control the South Korean government. (See Exhibit 14)

In its typical flippant fashion, Defendant argues that Plaintiff "undeterred" invested another €5 Billion into the South Korean Economy after the theft of the €3 Billion. Plaintiff's CEO flew to Korea, contacted the government officials he had met during the preparation of the €3 Billion investment. He was promised a return of the stolen funds, to no avail. After President Park was impeached, Plaintiff had reason to believe the corruption in the South Korean government had been addressed and taken care of. After President Park's impeachment was upheld in the Constitutional Court and Yoo Il-ho became acting interim Prime Minister. Later, AJ Energy learned that at least part of its €3 Billion were used by the Park government to reimburse the Korea Deposit Insurance Corporation (KDIC), the Korean equivalent to the American FDIC. KDIC had provided a bailout during the Asian financial crisis in 1997/98, and in 2015 the South Korean government was a majority shareholder in Woori Bank.

During the time of the Moon Presidential Campaign, AJ Energy met again with Yoo Il-ho and Choi Sang Mok.  As acting South Korean Prime Minister, Yoo Il-ho promised AJ Energy it would recoup its €3 Billion if AJ Energy agreed to invest €5 Billion in Government Bonds and other securities, in Government-approved projects and initiatives, in financial institutions and in the ailing South Korean Shipping Industry. AJ Energy agreed, as Lee Kwan-goo was no longer CEO of Woori Bank, and it believed the corruption and the government officials involved would be investigated and removed. AJ Energy agreed to the investment of €5 Billion during the time Yoo Il-ho was acting Prime Minister, as it believed that the total €8 Billion investment would be safe.

10

President Moon was elected May 9, 2017 and NRG filed its complaint for the missing €3 Billion on May 10, 2017, just one day after President Moon was elected. AJ Energy is working with Korean Government officials in the Moon administration and is in the process of obtaining supporting documents.

AJ Energy and its partners made every effort to retrieve the stolen funds. Attached is the July 24, 2018 declaration by Kwak Il-young, a South Korean Business Partner of AJ Energy , who describes in detail the measures he took to retrieve the missing €3 Billion. (See Exhibit 5). As stated in Plaintiff's FAC, part of the €3 Billion was to be invested in precious metals. Attached is the contract for the agreement to purchase gold bullions from Kwak Il-young's company YS Tech Holdings Ltd. Because of the theft by Woori Bank, the transaction never took place. (See Exhibit 6)

On December 27, 2017, Jimmy Kim of AJ Energy and NRG together with Robert Kim, CEO of NRG, filed criminal charges against Lee Kwan-goo and Lee Soon-ho, former CEO of Woori Bank. At that time, Jimmy Kim and Robert Kim's lives were being threatened and they had to leave the country to be safe. Kwak Il-young, who has made continued efforts to work with the South Korean government on behalf of AJ Energy and NRG, has told Plaintiff that his life has been threatened as well, and he does not leave his house without bodyguards. Plaintiff is expecting an affidavit from Kwak Il-young stating under oath that he has been threatened and warned not to further investigate AJ Energy's attempts to recover the stolen funds.

Defendants allege that AJ Energy filed complaints "around the world.". NRG filed the case regarding the missing €3 Billion in Korea. The case was dismissed, as the Court only considered Woori Bank's fraudulent evidence and refused to look at NRG's evidence, completely ignoring affidavits by Deutsche Bank Officials who were standing by to testify. It is not only impossible for AJ Energy to have a fair trial, but after Charles Kim's death, it would be dangerous to their lives.

11

The case filed in Orange County was based on false advice from the attorney they had chosen to handle the case. AJ Energy cannot be faulted for its attorney being compromised by Defendant. New York State is the correct and **only** forum in which AJ Energy can present its evidence, testimony and witnesses and know it will not be ignored by the Court.

### IV. Defendant's Allegation That Plaintiff's Documents Show Indicia of Fraud

Plaintiff is clarifying again that the document referred to as DKT 1-1 at 28 was erroneously attached. Once again, Defendantdoes not seem to understand. It was Plaintiff's attorney's good faith mistake to include the document in the original complaint. Of course, the document has the same transaction ID and Reference number. These are Deutsche Bank AG, Frankfurt's numbers and they would be the same in any transaction of this kind. Had Defendant done a minimum of due diligence and simply googled Maybrook Financial Ltd., it would have seen the same numbers for Deutsche Bank AG, Frankfurt. Once again, Defendant is intentionally trying to muddy the waters. There are two types of transaction ID's. One identifies Deutsche Bank AG, Frankfurt's transaction ID, which stays the same if Deutsche Bank AG, Frankfurt is involved in a transaction. In this case, the transaction ID/Code for the €3 billion is **090512DEUTDEFFXXX886479**. This number stays the same, as it is Deutsche Bank AG, Frankfurt's ID. The second transaction ID on top of the document is a transaction code **STS-NRV/VDS-15/09/72-BVV-17-51.** This second transaction ID/Code is the ID for **this specific** transaction. This ID/Code does never stay the same, as it refers to the transaction itself. Therefore, every transaction would have an individual transaction ID/Code as well. Plaintiff's attorney's mistake was to look only at Deutsche Bank AG, Frankfurt's transaction ID, only later realizing that the document concerns a different transaction involving a different party involved.

12

In Exhibit 9, on page 13 of the transfer slip information for the €5 billion, the transaction ID for Deutsche Bank AG, Frankfurt is the same on this document: **090512DEUTDEFFXXX886479**

The Transaction ID/Code for the specific €5 billion transaction is:

**DEUT:DEUT:HVBK/MFGL-AJE/10/02.2017**

The UTR (Unique Transaction Reference number) is**:**

**DEUT997856743216**

This is exactly the same number as the €5 billion, because this number identifies Deutsche Bank AG, Frankfurt. Again, Plaintiff's counsel apologizes for the oversight, but maintains that the erroneously added and then withdrawn document in no way contradicts our allegations. The document was added mistakenly and subsequently withdrawn by counsel.

As for the Document in Defendant signed by Deutsche Bank, then CFO of Deutsche Bank AG, Frankfurt, Maybrook Financial is an affiliate to Deutsche Bank AG, Frankfurt. The document could have been under either company's letterhead, and Plaintiff is seeking confirmation from Marcus Schenck regarding his signature and the above communication. (See Exhibit 8)

Defendant also states that in our Exhibit 9 of the FAC (See Exhibit 10) : "DEUTSCHE BANK AG IS THE LAWFUL OWNER OF THE PROPOSED FUNDS." Deutsche Bank AG, Frankfurt and Maybrook Financial Ltd. are affiliated. The document as stated is a business asset agreement between affiliated companies agreeing to make investments in government bonds and other securities, investments in government approved projects and initiatives, and investments in financial institutions. The contract speaks for itself.

Further, Defendant raises questions where there are none. An email sent to alexander@aj-energy.com and referenced in the FAC as "Exhibit 9, page 14," was sent by former CFO of Deutsche Bank AG, Frankfurt Marcus Schenck to Woori Bank Officer Mr. Yoon Soo Park. Yoon

13

Soo Park is named as the receiving party in Exhibit 9, page 3 of the business asset agreement, as the banking officer for the €5 Billion transaction. Woori Bank already had pulled the funds from the common account, and Mr. Schenk is providing a screen copy of the transaction ID **DEUT:DEUT:HVBK/MFGL-AJE/10/02.2017** between Maybrook Financial Group and AJ Energy. Also attached to the email were two pages of the Pre-advise letter, (See Exhibit 7) confirming once again to Woori Bank's CEO and Bank Officer at the time that the transfer of the money actually occurred. The funds had been sent to Woori Bank's common account with Deutsche AG, Frankfurt on February 13, 2017. The email was sent Thursday February 16, 2017, since 72 hours had passed since Deutsche Bank AG, Frankurt had transferred the funds and AJ Energy's account had not been credited. Since the funds from the €3 Billion transaction had been stolen, AJ Energy wanted to get verification of the transfer immediately. Once again, Woori Bank claimed it never received any funds. AJ Energy CEO Alexander Bobarykin immediately provided the documents as proof of transfer.

In FAC Exhibits 2, 3 and 11, which Defendant describes as "a series of incomprehensible documents naming inconsistent providers, receivers and beneficiaries of multi-billion deals," Plaintiff already explained each document referred to by Defendant in its FAC and its Opposition to Defendant's motion to dismiss. Exhibits 2 and 3 (See Exhibit 9 and 10) are joint venture agreements and business asset management agreement by the parties and beneficiaries to the transactions at issue. If Defendant finds them incomprehensible, Plaintiff suggests that Defendant retain an expert during discovery who can explain these documents to them. Regarding Exhibit 11, the document which evidences that Woori Bank was and likely still is, using AJ Energy's account to launder money and fraudulently use Jimmy Kim's identity. As we stated before, no cause of action regarding money laundering is alleged as AJ Energy is not incurring damages caused by the

illegal use of its account. The document confirms the pattern of Woori Bank's pattern of corrupt business practices.

## V.POST-FILING CORRESPONDENCE

Defendant goes back to the beginning of the case in NY, State Court. A first letter was sent to Plaintiff on April 5, 2018. Again Woori Bank does exactly what it accuses AJ Energy of doing; providing meaningless documents as evidence on Woori Bank's behalf. Attached to the letter telling plaintiff to withdraw its lawsuit is a statement from Deutsche Bank, Seoul purportedly saying that the two transactions at issue never happened. It further accuses Plaintiff of not doing its due diligence, while in fact, Defendant and its attorney are the party neglecting to do its due diligence. Throughout the complaint, Plaintiff emphasized that its business dealings are with Deutsch Bank AG, Frankfurt. Nowhere in any pleading did Plaintiff claim to have done business with Deutsche Bank, Seoul or Deutsche Bank, New York. A simple phone call to either bank would have made it clear that they have neither knowledge nor access to any transaction by Deutsche Bank AG, Frankfurt (See Exhibit 4). Even in the first letter sent by Defendant's counsel, it states that Woori Bank's common account No. W1024001KR does not exist. Again, a simple internet search would have shown that this account is Woori Bank's common account. (See Exhibit 1).

Also, Defendant should have been aware of its change in position, from first claiming that the account was between Woori Bank and Gazprom Bank in Russia, information that was also readily available through an internet search. (See Exhibit 1). Now, Woori Bank seems to be sticking with its fraudulent statement that the account does not exist. The letter was simply an attempt to discourage Plaintiff from seeking a rightful legal remedy. From the initiation of the

15

lawsuit, Defendant's plan of action was to scare Plaintiff and Plaintiff's counsel with the threat of sanctions, with the goal of preventing this case from reaching the discovery phase. In actuality, Defendants are the ones guilty of the conduct they accuse Plaintiff of. In spite of extensive documentation that can and will be verified in discovery,  Defendant keeps insisting that everything Plaintiff filed is fraudulent without providing any evidence to support its contentions. The only evidence it has provided is a perjured affidavit from a bank employee who has no access to Deutsche Bank AG, Frankfurt. (See Exhibit 2)

As for the UTR, veracity of documents is a discovery issue and ultimately should be determined by the Finder of Facts. Defendant again brings up the question of who is "Wehrhahn GmbH." Plaintiff has addressed the issue in its opposition to its motion to dismiss. Wehrhahn GmbH is a subsidiary of Deutsche Bank. Once again, Defendant is doing anything it can to confuse the issues. If necessary, questions about Wehrhahn GmbH will be responded to in discovery. Defendant is trying to litigate the case in the pleading stage. It is fully aware that when the lawsuit progresses to discovery, its perjured affidavit and other discovery issues, brought up in this motion as well as the motion to dismiss filed by Defendant prior, will come to light.

## VI. Deutsche Bank's Alleged Testimony

The document produced by Defendants that comes from Deutsche Bank, Seoul allegedly claims they found no evidence. First and again, Deutsche Bank, Seoul has no ability to look up this transaction. However, in this document, they went so far as to use an incorrect UTR number, instead of searching for the relevant UTR number and Reference number for each transaction. Instead of using the UTR number for the €3 Billion and the UTR for the €5 Billion, which obviously should be different since they are separate transactions, Defendants claim that the

Deutsche Bank UTR is the transaction UTR. However, just like Deutsche Bank, New York, Deutsche Bank, Seoul has no access to any transactions done by Deutsche Bank AG. They are a securities investment firm that is paying to use Deutsche Bank AG's name. The only actual banks that would have this access are their European Branches. Further, there is no signature on the document. Once again, Defendant's counsel intentionally did no investigation whatsoever. A simple phone call would have cleared up the issue. (See Exhibit 12)

Defendant states that we did not respond to their correspondence "despite being confronted with these issues." There is only one reason that Plaintiff's counsel did not respond: Defendant used forged documents and unrelated companies such as Deutsche Bank, Seoul to support its argument. Again, a simple phone call would have clarified that the overseas Deutsche Banks operate independently from Deutsch Bank AG. Further, at this time, Defendant's counsel already had made contact with Plaintiff's attorney Alexander Paykin, who never disclosed any communication it had with opposing counsel, to Plaintiff or Plaintiff's Orange County attorney. We have discussed in detail above why any document coming from Deutsche Bank, New York and/or Deutsche Bank, Seoul are not authentic. As to Deutsche Bank, New York, Defendant's counsel intentionally solicited a fraudulent affidavit (See Exhibit 2).

We have also addressed Defendant's issue with signatures on our exhibits. Once again, this is an issue appropriate for discovery, as that is where the veracity of documents should be questioned. Defendant repeatedly accuses Plaintiff of what Defendant itself is doing: providing fraudulent evidence. Repeatedly bringing up the same issue only shows that Defendant's counsel has not done anything but focus on its own fraudulent evidence, unlike Plaintiff's counsel, whose investigation is detailed and ongoing. Defendant is well aware that when confronted with live testimony and/or depositions of Deutsche Bank AG, Frankfurt officials, its so called "irrefutable"

17

evidence will easily be disproven. Plaintiff's counsel, who is fluent in German, will fly to Frankfurt

immediately when it is allowed to commence discovery. At the time of Defendant's third letter, it

had already established contact with Alexander Paykin, who unbeknownst to Plaintiff and Co-

Counsel had already promised that the case would be dismissed by a certain date. From the very

first letter, Defendant has done nothing but bully and threaten Plaintiff with sanctions. With this

motion,  it continues to do so, instead of focusing on the issues raised in the Complaint and FAC.


## VII.ARGUMENT WITH POINTS AND AUTHORITY

Defendant Motion for Sanctions under Rule 11 of the Federal Rules of Procedure does not

only have no merit but is entirely frivolous. It was filed with one goal in mind, to do whatever

it takes to hinder Plaintiff to ever commence discovery. Defendant even submitted two

perjured affidavits. (ex) With one telephone call, Plaintiff was able to confirm the

untruthfulness of Mohamed Kaba's affidavit.

The standard for Rule 11 Sanction is purposefully high, so as to not stifle legal creativity and

zealous advocacy. *City of Perry, Iowa v. Proctor and Gamble Co*., 2017 WL 2656250, at 2

(S.D.N.Y.) June 20, 2017. ("Courts have cautioned litigants that Rule 11 Sanctions are

reserved for extraordinary circumstance"). Among other things, a Court must "resolve all

doubts in favor of the signer" of the pleading, *Rodick v. City of Schenectady*, 1 F.3d 1341,

1350 (2d Cir.1993). Plaintiff has attached many exhibits, and only because Defendant claims

there are fraudulent, that does not make it true. During discovery the documents and their

authenticity will be confirmed by the only authority who can confirm them, Deutsche Bank

AG in Frankfurt, Germany. Defendant is guilty of what it accuses Plaintiff of doing, namely

submitting fraudulent evidence. A couple of telephone calls would have easily shown

Defendant that its affidavits are fraudulent. But then, since it drafted the affidavits, it is well aware that a call to Deutsche Bank in New York or for that matter any Deutsche Bank office in the US or South Korea, would have made it clear that they have no access at all, to any transactions by Deutsche Bank AG, Frankfurt. Further Rule 11 (b) (1) states that a rule 11 motion is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. *Mercury Air Grp. v. Mansour,* 237 F.3d 542, 548, (5th Cir.2001). Defendant is guilty of all of the above. Filing a baseless motion under Rule 11 shows how desperate Defendant is to avoid discovery at all costs. Defendant is fully aware that our documents will all be verified in discovery and stops not even at providing perjured affidavits (See Exhibit 4). Rule 11 (b) (3) states that the factual contentions have to have evidentiary support or, if specifically, so identified, will have evidentiary support after a reasonable opportunity for further investigation or discovery. Sanctions are not appropriate as Plaintiff has clearly supplied more than enough exhibits that are either direct evidence with the party drafting a document, able and willing to testify to its veracity or valid on its face. Defendant however, in bad faith submitted two affidavits by Mohamed Kaba, who is well aware that Deutsche Bank New York has no connection to Deutsche Bank AG, Frankfurt. Defendant and its counsel are also both aware that neither Deutsche Bank New York, nor Deutsche Bank Seoul have access to ANY transactions by Deutsche Bank AG, Frankfurt. In bad faith Defendant's counsel submitted a second affidavit from Mohamed Kaba, while already being aware that he does not have the capability to verify any transactions by Deutsche Bank AG, Frankfurt. Again, a simple call to a banker at Deutsche Bank New York would have invalidated Defendant's affidavits. Defendant therefore should be ordered to pay Plaintiff's legal fees it incurred drafting this opposition as it was clearly done to for an improper purpose,

namely to harass Plaintiff and delay discovery.   Defendant cites *Margo v. Weiss*, 213 F.3d 55

(2d Cir.2000) The case however is not on point. Plaintiff's complaint is neither subjectively

nor objectively unreasonable. While filed in good faith, every claim and allegation made also

has merit. It makes no sense at all for Plaintiff to have reported the case and the matter of

Charles Kim's death to the FBI for investigation. Why would Plaintiff take such a risk, if its

claims were fraudulent? The answer is clear, it wouldn't.

Defendant's reasoning is non-sensical. On page 14, Defendant claims that Plaintiff has

violated Rule 11(b) in at least 3 ways.

**1.**      Defendant alleges that the FAC false factual allegations have no evidentiary support

and are never likely to have any evidentiary support. Defendant makes that statement as if it

was fact. However, nothing could be further from the truth, as Plaintiff's FAC and Exhibits

show. Simply making a statement, does not make the statement true but then Defendant does

not seem to worry about the truth in its own statements. Plaintiff met the requirement stated in

*City of Yonkers v. Otis Elevator Co*., 106 F.R.D. 524-525 (S.D.N.Y 1985) that an attorney or

party in pleadings or other motions, and other papers be justifiable at the time they are signed.

The Court must neither allow hindsight to skewed judgement nor countenance belated

rationalizations concocted to conceal chicanery. Plaintiff has done nothing of this kind. It has

filed its complaint justifiably at that point and the FAC is still justifiable and factual. What is

not factual is Defendants allegations in this motion. The reason its filed it Rule 11 motion

prematurely, as it is ordinarily presented during or after the discovery period, when a court has

enough evidence to determine the veracity of a Plaintiff's allegations. *Luv N'Care, Ltd. v.

Shiboleth*, LLP, 2017 WL 3671039, at *13 (S.D.N.W. Aug. 8, 2017) Of course here

Defendant's goal is to prevent discovery from ever commencing. It is not interested in the facts

of the matter or the veracity of the evidence. Defendant however will not be able to do the same. Its affidavits by Mohamed Kaba of Deutsche Bank New York, will not and cannot ever have evidentiary support, as it is perjured. (See Exhibit 4)

Rule 11(b)(3) provides in pertinent part that, by presenting a complaint to the Court, the attorney signing or filing the complaint "certifies that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, …the factual contention have evidentiary support or, if specifically so identified are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. "

To succeed on a Rule 11(b)(3) motion, the moving party must make "a showing of objective unreasonableness on the part of the attorney or client signing the papers" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 150, (2d. Cir. 2009)

Here Plaintiff as well as its attorney have and are diligently investigating the matter and will be able to proof its allegations correct during discovery. Defendant, however simply seems to take its clients word for truth, without even the slightest bit of investigation. Instead, it goes even further and drafts and submits to the Court a perjured affidavit. Why Defendant would take a risk to produce such obviously false affidavits, when it can be disproven by a simple phone call to the institution whose employee signed the affidavit. There is simply no other explanation for Defendant's actions, then attempting intentionally mislead the Court and therefore Defendant should be sanctioned.  As for lacking evidentiary support, Defendant has nothing to say but to state over and over the exhibits attached to the FAC are forged. However, it states no credible grounds for its claims, as there are none. There is plenty of objectively reasonable evidence that the €3 Billion transaction happened, and Plaintiff will be easily able to prove that the transaction not only took place but that the theft occurred exactly how

21

Defendant alleged. Of course, Woori Bank did not provide any records of the transactions, it does not want the case to reach discovery. The affidavits by Mohamed Kaba have already been shown to be perjured statements. Kaba further states that no such account exists. Once again, had Defendant just done a cursory internet search it would have found that account W1024001KR is the common account of Woori Bank. (See Exhibit 1) Even though Defendant throughout its motion states that the common account above does not exist, strangely Yun Su Park does not deny the existence of the common in her affidavit, neither does she deny that AJ Energy and NRG, Ltd. have accounts at Woori Bank. Neither AJ Energy nor NRG would just open an account and then let it sit there. The purpose of opening these accounts was to receive the respective funds at issue, which were never transferred into either account. An affidavit of a Woori Bank General Manager would have been a perfect document to deny the existence of the account, but nothing in the affidavit refers to the common account as non-existent. As for Defendant's third point, we have addressed several times now, why Mohamed Kaba's affidavit cannot be true. (See Exhibit 2) Defendant keeps repeating the same argument over and over and keeps referring to Mohamed Kaba's affidavits. Again, Mohamed Kaba is an employee of Deutsch Bank, New York. Deutsche Bank New York has no access to any of Deutsche Bank AG, Frankfurt's transactions. Defendant intentionally neglects to mention that Mohamed Kaba does not work for Deutsche Bank AG, Frankfurt. Defendant acts in bad faith to keep the matter from moving forward and must therefore be sanctioned.

As for the €5 Billion transaction the above applies. Plaintiff again has proffered objectively reasonable evidence and discovery will reveal more detail in support of Plaintiff's allegations. Further Defendant again claims that the common account W1024001 does not exist. It relies once more only on the fraudulent affidavit by Mohamed Kaba. (See Exhibit 2). Defendant uses

the same reasoning by claiming Deutsche Bank has not identified any record of a common

account number. Again, Defendant misleadingly refers to Deutsche Bank New York without

stating though. Clearly Deutsche Bank New York has no records of the account, because once

again it has not access to any records kept by Deutsche Bank AG, Frankfurt. Neither does

Deutsche Bank Seoul. Defendant cites. *Austl. & N.Z. Banking Grp.*, 712 F. Supp. 2d at 264. In

this case the Court awarded sanctions where [the] complaint alleged email central to scienter

theory, but "the March 2007 emails simply did not exist" Here the emails referenced to and

documents provided do exist, are not fraudulent or concocted as Defendant seems be so fond

of saying. Each document submitted with the FAC is either evident on its face or will be

proven true during discovery. Defendant is reasonably worried about discovery as Plaintiff has

identified where records of the transactions can still be found and Defendant cannot delete

them as it did with its own servers.

Moreover, "Rule 11 is violated only when it is patently clear that a claim has absolutely no

chance of success*." Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir. 1986) (internal

quotation marks and citation omitted). Additionally, "when divining the point of which an

argument turns from merely losing to losing and sanctionable,…..Courts [must] resolve all

doubts in favor of the signer" of the pleading. *Rodick v. City of Schenectady*, 1 F.3d 1341,

1350 (2d Cir.1993) (internal quotation marks omitted). Here AJ Energy Alexander

Bobarykin's affidavit clearly states that he has provided exhibits attached to the complaint

which were either in his possession or had been provided to him by Deutsche Bank AG,

Frankfurt, the actual place where the transactions at issue originated. (See Exhibit 17).

Further Plaintiff's counsel has signed the pleading and the court must resolve all doubts

in favor of Plaintiff AJ Energy.

2.      Defendant claims there could not have been any reasonable investigation conducted before filing. Again, there is zero basis for Defendant's statement. Plaintiff has investigated the case ever since the first transaction lead to the theft of the €3 Billion. (see Affidavit Alexander Bobarykin Exhibit 17) Defendant's counsel here is guilty of what it claims Plaintiff to be; an utter lack of any investigation into its client Woori Bank. In addition, it even suborned perjury in providing the affidavits by Mohamed Kaba and neglecting to state that Mohamed Kaba is an employee of Deutsche Bank New York and not Deutsche Bank AG, Frankfurt. It seems as if Defendant's counsel did not even attempt to contact Deutsch Bank AG, Frankfurt, knowing full well, that Deutsche Bank AG, Frankfurt is the bank who provided the documents to Plaintiff. It is the case then, that Defendant's counsel did not make any reasonable enquiry, it did not investigate at all and tailored its affidavits fraudulently to fit its narrative. Indeed, sanctions are appropriate only where "it should have been patently obvious to any attorney who had familiarized himself [or herself] with the law" that the action was frivolous. *Four Keys Leasing & Maint. Corp. v. Simithis*, 849 F.2d 770, 773 (2d Cir. 1988) See also, e.g., *Healey v. Chelsea Res., Ltd*., 947 F.2d 611, 626 (2d Cir. 1991) (noting it must be "patently clear that a claim ha[d] absolutely no chance of success.") Here Plaintiff has not only done its initial investigation, it is still continuing to gather more and evidence which will prove Defendants claims intentionally fraudulent. Plaintiff has provided the underlying contracts to the transaction, actual records of the transactions and is now further providing affidavits from sources familiar with the case herein. (see Exhibit 5 and Exhibit 16). Not only does Plaintiff have a chance of success, when it is permitted to commence discovery, it is very probable that Plaintiff will prevail. Defendant can repeat the same statement over and over and it still does

not make its allegation true. And again, Defendant here intentionally makes false statements as to Plaintiff's investigation, while it did not do any investigation whatsoever.

Regarding the UTR brought up by Defendant, it once more is trying to muddy the waters. Had Defendant done its due diligence it would have found out that there are several different types of UTRs. Here Defendant claims that two different transactions cannot have the same UTR. The UTR it uses as an example is the UTR of Deutsche Bank AG, Frankfurt. Of course, this UTR will be the same in any transaction conducted by Deutsche Bank AG, Frankfurt. What they should have looked at is the transaction ID/Code **DEUT:DEUT:HVBK/MFGL-AJE/10.02.2017** transaction code for the €5 Billion  transfer and **STS-NRV/VDS-15/09/72-BVV-17-51** is the transaction ID/code for the €3 Billion transaction. In compliance with European Banking Regulations, first the parties to the transaction signed a contract/agreement or letter or of intent. Then the contract was forwarded to the compliance department where a transaction ID was created which usually contains the month and year when the contract was signed. The transaction was then forwarded to the server where the funds of the sending party were transferred into Woori Bank's common account. The transaction ID/Code is used throughout each individual transaction. Deutsche Bank's UTR number stays the same, as this number identifies the bank. Above is a brief overview but this issue should be handled in discovery where an expert can explain the intricacies of such transactions to a lay person. Defendant here tries to sow more confusion by randomly picking a number out of Plaintiff's exhibits and then uses this number out of context to turn the Plaintiff's allegations in its favor. The description Defendant uses is non-sensical.

**3.**     Defendant states the FAC was brought for an improper purpose. Fed. R. Civ. P. 11 (b)(1). Plaintiff has one purpose for filing this lawsuit only and the purpose is the return of its

stolen funds. Defendants use the Korean case as an example. In Seoul, South Korea Defendant was not allowed to show any of its own evidence and was prevented from reaching the discovery phase. (See Exhibit 16) Further South Korea is not a safe place for anyone involved in the transaction, hence Plaintiff contacted the FBI. As explained before, the Orange County Case was handled by a corrupt attorney. Defendant then also counts the move from New York State Court to Federal Court, when this move was initiated by Defendants. Plaintiff has not yet had the opportunity to present its case after discovery in a fair and unbiased trial. Due to Woori Bank's connections with a corrupt faction in the South Korean Government it never had a chance to receive a fair trial in South Korea (See Exhibit 5). Plaintiff deserves to be heard and his case deserves to be tried by a fair and unbiased finder of fact and its purpose is proper.

However, Defendants intent in filing this motion is clearly improper. The one and only purpose for Defendants filing of this Rule 11 motion is to delay discovery and/or ideally have Plaintiff's case dismissed. Defendant filed this motion in bad faith with the intent to prevent Plaintiff from ever receiving its day in Court and a fair trial. Again, Defendant's behavior is sanctionable.

**4.**     Defendant then alleges that Plaintiff should be sanctioned for not withdrawing its lawsuit. It is a fact that Defendant has bullied and harassed Plaintiff from the commencement of this lawsuit. It is using any means to prevent this case from ever reaching discovery, even intentionally submitting perjured affidavits (See Exhibit 4) Its bullying tactics worked in Sout Korea, where the Court was simply ordered not to consider any of Plaintiff's evidence. It also intimidated Plaintiff's prior counsel with its bullying and thread for sanctions. Paykin then acquiesced and began working against his client's best interest. This motion for sanctions is nothing more than another attempt at further harassment and intimidation, based on perjured

affidavits. From the first letter Defendant did nothing but threaten Plaintiff with sanctions. Its claim that, even when a complaint is filed in compliance with Rule 11, Plaintiff should have later withdrawn the case due to utter lack in support is baseless. Plaintiff is providing more and more evidence and/or exhibits that will lead to discoverable evidence during discovery. The statement is simply untrue. In *Galin*, 283 F. Supp. 3d at 203 (quoting *StreetEasy, Inc. v. Chertok,* 752 F.3d 298, 307 (2d Cir. 2014)), the Court states a failure to withdraw such a complaint despite warnings from the Defendant takes "their actions outside the ambit of 'zealous advocacy' and into the realm of Rule 11 Sanctions." Id.; *accord Otis*, 106 F.R.D. at 525. This case again does not apply to Plaintiff's matter. Plaintiff has provided more than enough evidence to support its claim and defending itself against Defendant's unethical and false claims is very much in the realm of zealous advocacy.

Plaintiff refuses to be scared by Defendant's underhanded and baseless claims. The refusal to dismiss is simply based on Plaintiff's solid claim against Woori Bank, and from its first communication it has done nothing but try to harass and intimidate Plaintiff, even going as far as intentionally soliciting affidavits from a prior/current client of Defendant, Deutsche Bank, New York, attempting to hide the fact that the affiant is not an employee of Deutsche Bank AG, Frankfurt, containing perjured testimony. While the purpose of Rule 11 is to "deter baseless filings in district court.*" Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). Rule 11 sanctions are appropriate only where there is clear evidence that a Plaintiff's claims are brought in bad faith. See *Browning Debenture Holders' Comm v. DASA Corp*., 560 F.2d 1078, 1088 (2d Cir.1977). The only party acting in bad faith is Defendant, with its perjured affidavits and attempts to distort the matter as to make

27

it seem impossible. However, Plaintiff's Exhibits and witnesses including affiants to this opposition show that Plaintiff's case is strong and deserves to see discovery.

Due to Defendant's bad faith, Plaintiff should be reimbursed for the cost of responding to this baseless motion and be ordered to pay sanctions as the Court sees fit.

**5**.      The Court should not dismiss the case nor should a Defendant acting in bad faith be rewarded with attorney's fees and costs. Plaintiff however, who is forced to defend itself against this motion which has no merit, should be reimbursed by Defendant's for the time spent to respond to an utterly baseless motion, where it intentionally relies on perjured affidavits which it dares to call "irrefutable" evidence. If the amount in controversy would be €100,000.00 instead of € 8 Billion, Defendants would likely not spent that much time and money on a bad faith motion with the only aim to prevent Plaintiff from ever reaching the process of discovery, followed by a fair trial.

**6.      The Court Should Not Dismiss Plaintiff's FAC Without Prejudice.**

Defendant her cites *Colliton,* 2008 WL 4386764, at *15 stating that "One appropriate sanction is the dismissal of [Plaintiff's] Amended Complaint for failure to state a claim, this sanction under Rule 11 serves as an alternate ground for dismissal." ;

*Abdelhamid v. Altria Grp., Inc*. 515 F. Supp. 2d384,400 (S.D.N.Y. 2007) (the appropriate sanction is dismissal of [Plaintiff's] Amended Complaint. Defendant here does not even allege that Plaintiff failed to state a claim. It moves straight to "The FAC is based on demonstrably false factual assertions and no amendment would cure the non-existence of the alleged transaction. Clearly the veracity of allegation is to be determined during discovery and Defendant will do anything, even employ perjured affidavits in its motion for sanctions. Plaintiff has and is still investigating the documents, contacting potential witnesses and

anything else it can do to advance the matter until discovery is allowed to commence. A claim is stated, enough documents support Plaintiff's allegation and discovery should begin as soon as possible so that Plaintiff can prove the veracity of the FAC.

**7.      The Court Should Award Attorney's Fees and Cost.**

*Katzman v. Victoria's Secret Catalogue*, 167 F.D.R. 649,661 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997) states that attorney's fees and costs may be awarded where "deterrence may be ineffective unless the sanction directs that some or all of [the] payment be made to those injured by the violation." Plaintiff of course cannot be deterred by Defendants underhanded and unethical conduct and should be reimbursed for all the hours and costs it has spent defending a not only baseless motion, but one intentionally made in band faith. An amount equal to reasonable attorney's fees and expenses it has incurred defending this vexatious motion. *Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG*, 2005 WL 3099592, at *7 (S.D.N.Y. Nov. 17, 2005) a reasonably accurate measure of the harm cause the [Defendant] has done, is what it has cost it's opponent." (citation omitted).

## VIII. CONCLUSION

Based the foregoing reasons and justifiably attached exhibits to oppose Woori Bank's Motion for Sanctions, Plaintiff should order AJ Energy to submit a bill of fees and costs reflecting the sum Plaintiff has expended to oppose Defendant's bad faith motion and order Defendant to reimburse Plaintiff for these fees and costs, including any reply briefing. Further Defendant respectfully requests additional punitive sanctions as the honorable Court deem appropriate.

Dated: August 3, 2018                              Respectfully submitted:

Santa Ana, California                              The Law Office of Ruth Cam


_____

Ruth Cam, Esq.
2030 E 4th Street, Suite 218A
Santa Ana, CA 92705

Fax: 844-272-6631
Tel: 714-488-9934
*Counsel for AJ Energy, LLC*