UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AJ ENERGY LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WOORI AMERICA BANK, WOORI BANK, and | ) |
| Does 1 through 50, inclusive, | ) |
| | ) |
| Defendants. | ) |

Case No. 18-cv-03735-JMF (BCM)

**ORAL ARGUMENT
REQUESTED**

# REPLY MEMORANDUM IN SUPPORT OF
## WOORI BANK'S MOTION FOR SANCTIONS AND
## OPPOSITION TO AJ ENERGY'S MOTION FOR SANCTIONS

O'HARE PARNAGIAN LLP
85 Broad Street, 16th Floor
New York, New York 10004
Tel: (212) 425-1401
Fax: (212) 425-1421

*Co-Counsel for Woori Bank*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

I. PRELIMINARY STATEMENT ........................................................................................ 1

II. FURTHER BACKGROUND .......................................................................................... 4

III. WOORI BANK'S MOTION FOR SANCTIONS SHOULD BE GRANTED ...................... 6

      A.     Plaintiff's Claims Lack Objectively Reasonable Evidentiary Support ................... 7

            1.     Plaintiff's Accusation Of Perjury Is Spurious And Unsubstantiated .......... 8

            2.     Plaintiff Mischaracterizes Woori Bank's Arguments About The Alleged Common Account And Concedes It Does Not Exist As Alleged ..................................................................................................... 11

            3.     Discovery Will Not Uncover Evidence Of The Alleged Transactions ....................................................................................... 13

      B.     Plaintiff Has Not Shown That Any Reasonable Investigation Was Conducted ........................................................................................... 15

      C.     Plaintiff's FAC Was Brought For An Improper Purpose ......................... 18

      D.     Plaintiff's Unreasonable Failure To Withdraw This Lawsuit Is Also Sanctionable ................................................................................. 21

IV. PLAINTIFF'S REQUEST FOR SANCTIONS SHOULD BE DENIED ........................... 22

V. CONCLUSION ........................................................................................................... 24

i

## TABLE OF AUTHORITIES

**CASES**                                                                    <u>Pages</u>

*Amorosa v. Ernst & Young LLP,*
    No. 03 Civ. 3902 (CM),
    2010 WL 245553 (S.D.N.Y. Jan. 20, 2010) ...................................................................15

*ATSI Communications, Inc. v. Shaar Fund, Ltd.,*
    579 F.3d 143 (2d Cir. 2009)..........................................................................................6

*In re Austlralia & New Zealand Banking Group Ltd. Securities Litigation,*
    712 F. Supp. 2d 255 (S.D.N.Y. 2010)........................................................................8, 15

*Browning Debenture Holders' Committee v. DASA Corp.,*
    560 F.2d 1078 (2d Cir. 1977).........................................................................................6

*Chien v. Skystar Bio Pharmaceutical Co.,*
    256 F.R.D. 67 (D. Conn. 2009)....................................................................................15

*Colida v. Nokia America   Corp.,*
    No. 05 Civ. 9920 KMW HBP,
    2006 WL 2597902 (S.D.N.Y. Sept. 11, 2006)..............................................................15

*In re Fosamax Products Liability Litigation,*
    No. 1:06-MD-1789-JFK,
    2010 WL 4242708 (S.D.N.Y. Oct. 27, 2010) ................................................................9

*Galin v. Hamada,*
    283 F. Supp. 3d (S.D.N.Y. 2017),
    *appeal filed,*No. 17-2988 (2d Cir. Sept. 27, 2017) .........................................................21

*Garvais v. Reliant Inventory Sols. Inc.,*
    No. 2:09-cv-0389,
    2010 WL 4722260 (S.D. Ohio Nov. 15, 2010),
    *report and recommendation adopted,*
    No. 2:09-cv-0389, 2011 WL 347111 (S.D. Ohio Feb. 1, 2011) ........................................9

*Gelfman International Enterprises v. Miami Sun International Corp.,*
    No. 05-CV-3826(CPS) (RML),
    2009 WL 2242331 (E.D.N.Y. July 27, 2009) ...............................................................18

*Gissinger v. Yung,*
    Nos. CV-04-0534 (BMC), (JO), CV-04-5406 (BMC)(JO)
    2007 WL 2228153 (E.D.N.Y. July 31, 2007)...............................................................19

*Grodotzke v. Seaford Avenue Corp.,*
    17 F. Supp. 3d 185 (E.D.N.Y. Apr. 28, 2014) ..............................................................19

*Gutierrez v. Fox*,
    141 F.3d 425 (2d Cir. 1998)..............................................................................18

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018) ...............................................................................23

*Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.*,
    -- F. Supp. 3d ---, No. 16cv7619,
    2018 WL 3830065 (S.D.N.Y. Aug. 13, 2018)..................................................23

*Kulhawik v. Holder*,
    571 F.3d 296 (2d Cir. 2009)..............................................................................10

*Luv N' Care, Ltd. v. Shiboleth, LLP*,
    No. 16-cv-3179 (AJN),
    2017 WL 3671039 (S.D.N.Y. Aug. 8, 2017)...................................................13

*Morely v. Ciba-Ceigy Corp.*,
    66 F.3d 21 (2d Cir. 1995)..................................................................................18

*StreetEasy, Inc. v. Chertok*,
    752 F.3d 298 (2d Cir. 2014)..............................................................................21

*United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen &*
    *Helpers of America , AFL-CIO*,
    948 F.2d 1338 (2d Cir. 1991)..............................................................................6

*Wolters Kluwer Financial Services Inc. v. Scivantage*,
    No. 07 CV   2352 (HB),
    2007 WL 1098714 (S.D.N.Y. Apr. 12, 2007)...................................................15

Defendant Woori Bank, by and through its counsel, respectfully submits this reply memorandum of law in support of its motion for sanctions against Plaintiff AJ Energy LLC ("Plaintiff") pursuant to Rule 11 of the Federal Rule of Civil Procedure and in opposition to Plaintiff's motion for sanctions, to the extent Plaintiff has properly made such a motion.

## I. PRELIMINARY STATEMENT

Woori Bank's Rule 11 motion establishes with affirmative evidence that the two wire transfers alleged in Plaintiff's First Amended Complaint ("FAC") never happened.   (Dkt. 34, ("Motion" or "Mot.").)   Deutsche Bank's Anti-Financial Crime Division has researched the two alleged wire transfers and affirms that Deutsche Bank did not execute either one.   Woori Bank's declarant affirms that Woori Bank never received the two alleged wire transfers, and has no record of the alleged transactions.   If that were not enough, Deutsche Bank further confirms it has no record of the alleged "common account" identified in the FAC, from which Woori Bank allegedly stole Plaintiff's funds.   Without that account, which Plaintiff alleges Woori Bank holds with Deutsche Bank to facilitate international transactions, neither of the alleged multibillion transfers from Plaintiff's business partners could be possible.   The FAC is based entirely on wire transfers that never happened.

The Motion also showed that documents Plaintiff submitted as evidence of the transactions are not authentic.   Woori Bank's methodical review of those exhibits reveals: implausibly recurring "unique" transaction reference numbers that do not conform with published standards; inconsistent transaction dates; overlapping account numbers simultaneously held by two entities; mismatched signatures; and beneficiaries (First Clearing, LLC, Contained Media Group, LLC, and Wehrhahn GmbH) that are not Plaintiff and are not alleged to be associated with Plaintiff. Among this mess of documentation are communications attributed to Deutsche Bank, which are

inauthentic according to its Anti-Financial Crimes Division, as are the mismatched signatures appearing on those documents.   The only reasonable conclusion to be drawn is that the documents submitted with the FAC are fabrications and forgeries, concocted to support false allegations in the hopes of extorting a settlement from Woori Bank.

In response, Plaintiff submits *no* admissible countervailing evidence.   Plaintiff's opposition brief (the "Opposition" or "Opp.") comes with 17 exhibits, including three affidavits, and spins a distracting tale of international intrigue involving Korean presidential politics.   But no part of the Opposition and not one of the purported factual submissions shows €8 billion leaving the Deutsche Bank accounts of Plaintiff's alleged business partners—Hestiun Finance Limited ("Hestiun") and Maybrook Financial Group Ltd. ("Maybrook")—neither of which submits testimony in support of Plaintiff's allegations.   Also conspicuously absent from Plaintiff's Opposition is any attested submission from Deutsche Bank, despite Plaintiff's repeated (but inconsistent) claims that it both already possesses such testimony and that Deutsche Bank witnesses are eager to provide it later, if only the Court will permit discovery to commence.   The evidence is missing because the transactions never happened.

Thus, Woori Bank's Motion and Plaintiff's convoluted Opposition supply a firm conviction that Plaintiff and its counsel have violated Rule 11 in several distinct ways.   First, as the Motion showed, Plaintiff's claims lack objectively reasonable evidentiary support.   If there were any such evidence, Plaintiff would have identified it with the Opposition—for example, by supplying a bank statement from Hestiun or Maybrook showing billions of Euro leaving their accounts or an affidavit from Deutsche Bank.   Instead, Plaintiff's primary tactic is to accuse Deutsche Bank of perjury.   Plaintiff observes that the Deutsche Bank affiant is located in New York and baselessly speculates that Deutsche Bank, like McDonald's, is structured as a series of

2

disconnected franchises with no one in New York able to learn anything known by Deutsche Bank elsewhere.   As "proof," Plaintiff appends uncertified transcripts of unsworn conversations between a "consultant" and two individuals apparently tasked with answering inquiries on a Deutsche Bank customer service line, who answered a cold call without any investigation at all. Plaintiff is far from demonstrating perjury, much less that the alleged wire transfers actually occurred, and no amount of discovery will prove what never actually happened.

Second, Plaintiff could not have conducted a reasonable pre-suit investigation.   The red flags identified in Woori Bank's Motion and correspondence are too numerous and consequential, and the Opposition's explanations raise still more questions.   Most notably, Plaintiff attempts to explain how the Unique Transaction References for three different transactions on three different dates are identical and why they fail to follow the accepted style for incorporating the transaction's date, as shown in the publications Woori Bank submitted.   The Opposition proposes that these Unique Transaction References are neither unique nor a reference to the transaction, but simply refer to Deutsche Bank.   This facially absurd claim is nothing more than argument from counsel without a trace of support from any independent source (other than the affidavit of Mr. Bobarykin, a principal of Plaintiff who does not possess any special knowledge in this arena and who relies on no sources).   Any reasonable inquiry should have prevented counsel from filing this case.

Third, the FAC was filed for improper purposes.   Plaintiff sued in New York after losing in South Korea and dismissing a complaint in California.   Plaintiff's serial false allegations are harassing, contribute to delay, and increase the cost of litigation.   Plaintiff's response is a lengthy and burgeoning conspiracy theory.   Plaintiff informs this Court, based only on the unattested assertions of counsel, that the South Korean judicial system is rife with corruption and that the government of South Korea at its highest levels is in cahoots with Woori Bank.   According to

Plaintiff's vision, this case is ultimately connected in some vague and nefarious way to the death of a U.S. citizen abroad.   What is not shocking about these shocking claims, though, is that they are supported by no evidence whatsoever.

The only admissible, competent evidence before the Court establishes that Plaintiff's case is built on falsity.   The Court should dismiss the FAC with prejudice and award Woori Bank its attorney's fees and costs.

For similar reasons, Plaintiff's motion for sanctions against Woori Bank must fail. Plaintiff has made no formal motion identifying a basis for relief.   And, even construing Plaintiff's contentions most generously, there is no basis for awarding sanctions against Woori Bank.   Plaintiff argues that: (1) the Deutsche Bank affiant's location in New York renders impossible his conclusions that he investigated Deutsche Bank records relating to Germany; and (2) Woori Bank "intentionally misconstrued" the meaning of account numbers, SWIFT codes, and UTRs.   (Dkt. 39 at 2.)

As stated above and demonstrated below, Plaintiff provides no reliable factual bases for its claims that Deutsche Bank's conclusions are in any way invalid, much less "perjured," or for Plaintiff's far-fetched theories about how Unique Transaction Reference numbers work.   As such, Plaintiff's motion, to the extent Plaintiff has made one, should be denied in its entirety.

## II. FURTHER BACKGROUND

Developments since Woori Bank served notice of its Motion on June 15, 2018 show that Plaintiff unreasonably refuses to disavow the false allegations in the FAC.   Woori Bank filed the Motion on July 10, 2018.   (Mot. 5 & n.2.)[1]   On July 19, 2018, Plaintiff's counsel filed a letter to

---

[1] As explained in the Motion, the filed version was substantially identical to the served motion. (Mot. 5 n.2.)   Woori Bank had received an updated version of the Kaba Affidavit from Mr. Kaba

the Court.   That letter acknowledged that Plaintiff had received notice of Woori Bank's Rule 11 arguments but elected not to amend the FAC.   (Dkt. 39 at 1 ("Our complaint is as detailed as it can be.").)

The letter revealed for the first time that Plaintiff was "also in the process of drafting its own Rule 11 Motion for Sanctions against Woori Bank's attorneys." (*Id.* at 2.)   In this regard, the letter identified "[t]wo issues . . . to be addressed." (*Id.*)   Plaintiff alleged that Deutsche Bank, New York "would not be aware of these transactions handled by Deutsche Bank, AG in Frankfurt, Germany," and that "Woori Bank's counsel intentionally misconstrued account, Swift and UTR numbers in order to confuse the issues . . . ." (*Id.*)

On July 24, 2018, the due date for Plaintiff's Opposition, Plaintiff filed another letter. Plaintiff again acknowledged receipt and notice of Woori Bank's Rule 11 arguments, and again affirmed that "[o]ur complaint stands as it is." (Dkt. 42 at 1.)   That letter sought additional time to respond to Woori Bank's Motion, through July 31, 2018.   The Court granted the extension and further ordered Plaintiff to support any affirmative motion for sanctions in the same memorandum as Plaintiff's opposition to Woori Bank's Motion.   (Dkt. 44.)

On July 30, 2018, Plaintiff filed a third letter to the Court, seeking another extension of time and an expansion of the page limit.   (Dkt. 45.)   In that letter, Plaintiff represented to the Court that the brother of one of Plaintiff's principals "was killed on Thursday July 26, 2018," and that "[t]he suspect has close ties to President Moon's presidential campaign and we have found out from other South Korean Government Officials that part of the stolen money was used to fund

---

(addressing Plaintiff's amended pleading) after serving notice of the Motion in June and submitted the updated affidavit with the filed Motion.   Nevertheless, in the Motion, Woori Bank cited only the earlier version that had been first served on Plaintiff (Dkt. 36) (the "Kaba Aff.").   Now that Plaintiff has had ample notice of Mr. Kaba's updated affidavit (Dkt. 37), Woori Bank refers also to that updated affidavit here (the "Kaba Supp. Aff.").

President Moon's presidential campaign." (*Id.* at 1.)   Plaintiff stated it "immediately informed the FBI" and would "have no other choice than to be more detailed in disclosing the relationship between Woori Bank and the South Korean Government," suggesting that such information had been withheld for some reason from earlier pleadings. (*Id.* at 2.)   Plaintiff's counsel represented that "[t]his case has now caused the death of Plaintiff's brother," and that "[w]e are concerned for our client's safety," because of "[t]hreats of bodily harm and even death threats," although Plaintiff did not identify the source, recipient, or date of any such threats. (*Id.*)

The Court granted the extension to August 3, 2018.   (Dkt. 46.)   Plaintiff filed its brief on August 4, 2018 (after the midnight deadline).

### III. WOORI BANK'S MOTION FOR SANCTIONS SHOULD BE GRANTED

Plaintiff concedes that the Rule 11 standard is one of "objective unreasonableness on the part of the attorney or client signing the papers." (Opp. 21 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009).)   Because subjective good faith is therefore irrelevant, the Court should disregard Plaintiff's contrary insistence that "Rule 11 sanctions are appropriate only where there is clear evidence that a Plaintiff's claims are brought in bad faith." (Opp. 27.)[2]

Plaintiff further agrees that Rule 11 tests whether the papers were "justifiable at the time they are signed" (*id.* at 20 (quoting, without attribution, *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1344 (2d Cir. 1991)), and that the Court "must neither allow hindsight to skewed [sic] judgement [sic] nor countenance

---

[2] Plaintiff cites *Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1088 (2d Cir. 1977), for that incorrect proposition, but *Browning* addresses inherent power sanctions, not Rule 11.

belated rationalizations concocted to conceal chicanery." (*Id.*)   Accordingly, the Court should disregard Plaintiff's repeated—but irrelevant—assertion that its investigation remains ongoing. (Opp. 17, 21, 24, 28.)   The question is whether Plaintiff's *pre-filing* inquiry, if any, was objectively reasonable.   Here, it demonstrably was not.

Indeed, the Motion demonstrated: (A) that Plaintiff's claims lack objectively reasonable evidentiary support because they are based on transactions that Woori Bank has shown never occurred; (B) no reasonable pre-suit investigation could have been conducted given all the red flags showing the transactions never occurred; (C) these false allegations were brought for improper purposes, *i.e.*, to extort a settlement; and (D) the subsequent failure to withdraw the FAC is independently sanctionable, given the depth and specificity of Woori Bank's notice to Plaintiff. The Opposition only confirms each of these bases for sanctions.

### A.      Plaintiff's Claims Lack Objectively Reasonable Evidentiary Support

Woori Bank's Motion presents testimony from knowledgeable sources and methodically reviews the documents attached to the FAC to show that the alleged wire transfers at the heart of the FAC never happened.   (Mot. 15-18.)   In particular, an Assistant Vice President in Deutsche Bank's Anti-Financial Crime Division, Mr. Kaba, investigated Plaintiff's allegations and affirms that Deutsche Bank "did not execute" either of the two wire transfers alleged in the FAC, and that Deutsche Bank "has not identified any record" of those transactions.   (Kaba Aff. ¶¶ 3-4, 6-9; *see also* Kaba Supp. Aff. ¶¶ 6-10, 12-14.)   Deutsche Bank's submission to a Korean court similarly states that the bank could find no record of the alleged €3 billion transaction.   (Dkt. 48-1 at 100 of 119.)   Woori Bank's General Manager has affirmed that Woori Bank likewise has no record of either of the alleged wire transfers.   (Dkt. 38 ("Park Decl.") ¶¶ 3-4.)

Deutsche Bank's investigation also "has not identified any record of a common account number matching the one referenced in paragraph 17 and 24 of the First Amended Complaint."

(Kaba Supp. Aff. ¶ 15; *see also* Kaba Aff. ¶ 10 (referencing paragraph 39 of original complaint; Dkt. 48-1 at 100 of 119.).)   Nor can Deutsche Bank identify any record of the account allegedly associated with Plaintiff's business partners, from which purportedly missing funds were sent. (Kaba Supp. Aff. ¶ 16.)

Consistent with this evidence showing the alleged transactions did not occur, Woori Bank's methodical review of the FAC's attachments further shows that the documents purporting to substantiate the transactions are full of inconsistencies and facially implausible assertions, rendering them objectively unreasonable.   (Mot. 8-11.)   These concocted transactions are not collateral, but central to the case, further supporting sanctions here.   *See In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 712 F. Supp. 2d 255, 264 (S.D.N.Y. 2010).

In response, Plaintiff argues that: (1) Mr. Kaba's affidavit is perjured; (2) Woori Bank is taking inconsistent positions about the existence of the alleged "common account"; and (3) discovery will reveal additional facts to support Plaintiff's FAC.   None of these arguments supplies objectively reasonable evidentiary support for the FAC.

### 1.   Plaintiff's Accusation Of Perjury Is Spurious And Unsubstantiated

Plaintiff's accusation of perjury is based on its observation that Mr. Kaba is located in New York, not Frankfurt.   (Opp. 22-23.)   According to Plaintiff's speculation about the internal operations of a bank with global operations, "Deutsche Bank New York" is like a McDonald's franchise (*id.* at 7-8), and cannot access information about transactions executed by Deutsche Bank, AG in Frankfurt.   Plaintiff therefore concludes that Mr. Kaba's presence in New York renders impossible the substance of his affidavit—*i.e.*, that he investigated the transactions at issue and found they did not occur.   Plaintiff further theorizes that Mr. Kaba allegedly nevertheless agreed to sign affidavits with false conclusions as a "favor," because Deutsche Bank New York is also a client of Woori Bank's counsel.   (*Id.* at 7.)

Plaintiff's "proof" in support of these unconnected dots are uncertified transcripts of two telephone calls made by Plaintiff's "consultant" to individuals who apparently were assigned to a Deutsche Bank customer service line, and who were not under oath when speaking.   (Dkt. 48-1 ("Opp. Ex.") 4 at 18 of 119, (the "Ferreira Affidavit").)   The unsupported and conjectural assertions against Mr. Kaba's testimony should be rejected for at least three reasons.

*First*, the Ferreira Affidavit is inadmissible as evidence that Mr. Kaba could not access Deutsche Bank, AG.   The testimony lacks foundation, as it depends on information purportedly derived by speaking with individuals whose full names are unknown, whose titles are unknown, who have no demonstrated nexus with the information sought, and who engaged in no inquiry at all into the questions raised.   *See, e.g., In re Fosamax Prods. Liab. Litig.*, 2010 WL 4242708, at *1-2 (S.D.N.Y. Oct. 27, 2010) (excluding evidence for lack of "adequate foundation").   The statements reflected in the "transcripts" of Mr. Ferreira's conversations are also unsworn hearsay, offered for the truth of their contents.   *See Garvais v. Reliant Inventory Sols. Inc.*, 2010 WL 4722260, at *5 (S.D. Ohio Nov. 15, 2010) (excluding hearsay testimony submitted within affidavits in connection with sanctions motion), *report and recommendation adopted*, 2011 WL 347111 (S.D. Ohio Feb. 1, 2011).   Based on the face of the "transcripts" attached to the Ferreira Affidavit, the two individuals could not have known that someone else would be relying on their unresearched statements in a court proceeding, and their inadmissible answers to cold calls should be ignored.

Moreover, it is not even clear what entity Mr. Ferreira claims to have called.   He says it was "Deutsche Bank New York," but the transcripts strongly suggest he was speaking to individuals who work on private wealth management, not retail or commercial banking.   (Opp

Ex. 4 at 24 of 119 ("In the US we are private wealth management . . . ."); *id.* at 28 of 119 ("Since we are US base, private wealth.").)

*Second*, there is no actual evidence that Mr. Kaba failed to conduct the investigation identified in his affidavits.   That assertion is based entirely on the unattested arguments of counsel and an unsubstantiated analogy to McDonald's franchises.   *See Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) ("An attorney's unsworn statements in a brief are not evidence.").   The sole admissible evidence before the Court is Mr. Kaba's sworn testimony that he is "in Deutsche Bank's Anti-Financial Crime Division," which on its face is highly relevant to the investigation he undertook; that he is "authorized by Deutsche Bank to make" his affidavits; and that he "conducted an investigation prior to executing" his testimony.   (Kaba Supp. Aff. ¶¶ 1-2, 4; *see also* Kaba Aff. ¶ 2 ("I have reviewed the Complaint and the attachments thereto, and have searched the records of Deutsche Bank concerning the existence of the transactions alleged in the Complaint.").) Plaintiff's conjecture about the information that would be accessible to Mr. Kaba in New York does not overcome this competent testimony.

*Third*, counsel represents Woori Bank in this litigation.   There is no evidence that Mr. Kaba signed the affidavits as a "favor."   The fact that Woori Bank's counsel may represent Deutsche Bank in unrelated matters is irrelevant.

In the end, Woori Bank has submitted to the Court duly executed testimony from Deutsche Bank's Anti-Financial Crime Division, based on an investigation conducted by the affiant and authorized by Deutsche Bank, AG.   In contrast, Plaintiff offers the uncertified transcripts of recorded phone calls with unknown individuals of unknown seniority and whose duties and experience are unknown, and who were not under oath when speaking.   Plaintiff is far from

showing Mr. Kaba's testimony to be perjured and farther from showing that either alleged

transaction is supported by objectively reasonable evidence.

**2.    Plaintiff Mischaracterizes Woori Bank's Arguments About The Alleged Common Account And Concedes It Does Not Exist As Alleged**

Plaintiff next attempts to shore up its allegations by claiming Woori Bank is taking

inconsistent positions about whether the alleged "common account" exists.   (Opp. 22; FAC ¶¶ 17,

24.)   Plaintiff misrepresents Woori Bank's argument and ultimately concedes that both the

Complaint's allegations and Plaintiff's testimony about the "common account" are false.

Woori Bank has consistently argued that "both purported wire transfers allegedly involved

depositing funds in a 'common account'" with a specific account number (Mot. 17), which Woori

Bank allegedly holds "with Deutsche Bank," (FAC ¶ 40), and that such an account between the

two banks does not exist.   This position is based on, and in direct reaction to, the FAC and the

testimony of Plaintiff's CEO, who asserts that the allegedly missing funds were transferred to

"Woori Bank's common account with Deutsche Bank, AG."   (Opp. Ex. 17 at 108-09 of 119,

("Bobarykin Aff.") ¶¶ 7, 9, 12.)[3]

Accordingly, Woori Bank inquired with Deutsche Bank to determine whether the alleged

common account exists, but Deutsche Bank has no record of any such account held between Woori

Bank and Deutsche Bank, fatally undermining Plaintiff's entire case.   (Kaba Supp. Aff. ¶ 15; *see

also* Kaba Aff. ¶ 10.)   Thus, Woori Bank has consistently argued that the common account held

between Woori Bank and Deutsche Bank alleged in the FAC does not exist.[4]

---

[3] Indeed, Plaintiff's FAC attached a purported letter from Deutsche Bank's CFO claiming that Deutsche Bank's "records show that Woori Bank pulled the funds from the common account [account number] on 8 March 2017."   (Dkt. 19-2 ("FAC Ex.") 12 at 43 of 44.)   This submission makes sense only if the common account is held *at Deutsche Bank.*

[4] Plaintiff claims Woori Bank admitted the existence of the account number associated with the alleged "common account" in the Korean Litigation, but does not support that claim with any

In any event, Plaintiff's new evidence for the existence of the alleged "common account" falls short of supporting the FAC.   Plaintiff offers an image from non-party Gazprombank's website, which lists an account at Woori Bank and the account number of the "common account" as among Gazprombank's "Correspondent Network."[5]   (Opp. Ex. 1 at 3 of 119.)   On its face, this is not evidence of an account between Woori Bank and Deutsche Bank.

In an attempt to reconcile the new evidence with Plaintiff's allegations, Plaintiff argues that a "common account is not one account with one other bank; it is used by many banks in different countries to make international transactions easier."   (Opp. 8.)   As support, Plaintiff cites the Wikipedia entry for "Correspondent account," but that article directly contradicts Plaintiff's claim.   (Opp. Ex. 15 at 93 of 119.)   The Wikipedia article explains that such an account is "established by *a* banking institution to receive deposits from, make payments on behalf of, or handle other financial transactions for *another* financial institution.   Correspondent accounts are established through *bilateral* agreements between *the two banks*."   (Opp. Ex. 15 at 93 of 119 (emphases added).)   This cannot be reconciled with Plaintiff's claim that the alleged "common account" is used by many banks and, given the requirement of a "bilateral agreement," a

---

evidence.   In any event, Woori Bank has never argued that there is no account anywhere in the world with the alleged account number.   Rather, Woori Bank argued that the Kaba Affidavit shows that the "common account" as alleged in paragraph 39 of the initial Complaint does not exist.   (Mot. 17 (citing Dkt. 1-1 ¶ 39).)   Mr. Kaba has reaffirmed that testimony with respect to the FAC (Kaba Supp. Aff. ¶ 15), demonstrating that the "common account" as alleged in the FAC does not exist.

[5] Exhibit 1 to Plaintiff's Opposition is also inadmissible for lack of authentication.   This exhibit is attached to the Opposition with no information provided that "support[s] a finding that the item is what the proponent claims it is."   Fed. R. Evid. 901(a).   Indeed, Plaintiff has not even included a declaration describing where the document came from or what Plaintiff purports the document to be.   Exhibits 3, 6, 12, and 14-15 similarly lack authentication and should also be disregarded by the Court.

correspondent account between Woori Bank and Gazprombank (*see* Opp. Ex. 1 at 3 of 119), could not also be the alleged "common account" between Woori Bank and Deutsche Bank.

The fact remains that the FAC turns on the existence of a Deutsche Bank common account, and Deutsche Bank has no record of such an account.   Plaintiff submits no evidence that any account meeting the description in the FAC actually exits.   Accordingly, Plaintiff's Opposition has not shown that its claims have evidentiary support.

### 3.   Discovery Will Not Uncover Evidence Of The Alleged Transactions

Plaintiff argues that it "will be able to proof [sic] its allegations correct during discovery," and that Woori Bank's Rule 11 Motion is therefore premature.   (Opp. 21; *see id.* 20 (citing *Luv N' Care, Ltd. v. Shiboleth, LLP*, 2017 WL 3671039, at *13 (S.D.N.Y. Aug. 8, 2017).)   This request for discovery is particularly misplaced here because Plaintiff argues that *direct* evidence of the two alleged wire transfers is *already in Plaintiff's possession.*   Plaintiff's failure to submit that evidence with the FAC or with its Opposition again shows that the transactions never really occurred and that additional discovery is unnecessary.

For instance, Plaintiff says it submitted "affidavits by Deutsche Bank Officials who were standing by to testify" in support of Plaintiff in the Korean case brought by NRG Co. (the "Korean Litigation").   (Opp. 11.)   Plaintiff tellingly fails to attach those here, claiming inconsistently that "Plaintiff is in the process of obtaining affidavits by Deutsche Bank AG, Frankfurt" (*id.* at 8), and "is seeking confirmation from Marcus Schenck regarding his signature" on the documents Plaintiff submitted to the Court (*id.* at 13).   But Woori Bank first challenged the factual bases for Plaintiff's claims in a letter dated April 5, 2018, over four months ago, and served notice of the instant Motion on June 15, 2018.   If Plaintiff had the ability to produce an affidavit from Deutsche Bank confirming the existence of the alleged transactions, it would have and should have done so by now.

Plaintiff also claims to be "working with US government officials who are determined to bring the truth to light," and "working closely with Yoo Il-ho, Deputy Prime Minister of South Korea and also Minister of Strategy and Finance (MOSF), and Choi Sang Mok, Deputy Minister of MOSF," to further develop evidence in support of Plaintiff's allegations.   (Opp. 9.)   If that were so, Plaintiff should have been able to submit testimony from at least one of these individuals. The failure to do so is further evidence the claims are fabricated.

Beyond the evidence Plaintiff claims to possess already, additional evidence should be obtainable directly from Plaintiff's business partners, but that too is missing from Plaintiff's submission.   For instance, Plaintiff submits *no evidence* that the allegedly missing funds were actually possessed by Plaintiff's business partners, Hestiun and Maybrook.   If such funds were actually transferred out of their accounts as alleged (FAC ¶¶ 21, 40), Plaintiff should have been able to provide a bank account statement showing both the existence and the withdrawal of €3 billion or €5 billion.   Instead, the documents attached to the Complaint and to the Opposition brief are purported contracts and SWIFT messages.   Even if credited, these documents would evidence, at most, an *agreement* to transfer funds or *an instruction* to transfer funds from the business partner's account to the alleged "common account" at Deutsche Bank.   Conspicuously missing is *any* document showing that money actually left the accounts of Hestiun or Maybrook. Put simply, Plaintiff's purported evidence is all about missing *credits*, without ever showing that the originating *debit* actually happened.

If Plaintiff's business partners could show the funds left their accounts, that documentation should have been among the agreements and instructions between Hestiun, Maybrook, and Plaintiff that are attached to the pleadings.   If it existed, such crucial evidence should have been

easy for Plaintiff to obtain and would not be in Woori Bank's possession.   Discovery is therefore completely unnecessary to unearth such evidence, if indeed it existed.[6]

Because Plaintiff's request for more time to conduct such discovery is misplaced, Woori Bank's Motion is not premature.   When confronted with Rule 11 violations this plain, and notwithstanding Plaintiff's reference to *Shiboleth*, courts routinely grant Rule 11 sanctions motions at the pleading stage.   *See, e.g.*, *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 712 F. Supp. 2d 255, 264 (S.D.N.Y. 2010); *Amorosa v. Ernst & Young LLP*, 2010 WL 245553, at *1 (S.D.N.Y. Jan. 20, 2010); *Chien v. Skystar Bio Pharm. Co.*, 256 F.R.D. 67, 79 (D. Conn. 2009). The Court should do so here as well.

**B.**   **Plaintiff Has Not Shown That Any Reasonable Investigation Was Conducted**

Woori Bank's Motion specifies several significant red flags that render the documents Plaintiff relies on in the FAC highly suspect and outright disprove the transactions they purport to evidence.   (Mot. 8-11.)   Plaintiff's Opposition fails to explain plausibly or with *evidence* how those documents or the transactions could be authentic.   The Opposition therefore gives the Court no basis to conclude that a reasonable pre-suit investigation actually occurred.

---

[6] Given Plaintiff's record of attaching previously undisclosed documents to each new filing, Woori Bank proactively objects to any new evidence Plaintiff might submit with its August 24, 2018 brief, as that would be tantamount to filing a sur-reply brief in connection with Woori Bank's motion.   Woori Bank respectfully submits that Plaintiff must not be allowed to use a reply memorandum in support of Plaintiff's motion as a sur-reply in opposition to Woori Bank's.   *See* Individual Rules of Practice in Civil Cases, available at http://www.nysd.uscourts.gov/cases/show.php?db=judge_info&id=1453, at 5 (S.D.N.Y. 2017) (Furman, J.) ("Sur-reply memoranda will not be accepted without prior permission of the Court."); *see also Colida v. Nokia Am. Corp.*, 2006 WL 2597902, at *4 (S.D.N.Y. Sept. 11, 2006) ("[I]t was improper for plaintiff to submit these sur-reply papers without leave of the court."); *Wolters Kluwer Fin. Servs. Inc. v. Scivantage*, 2007 WL 1098714, at *1 (S.D.N.Y. Apr. 12, 2007) ("'[I]t is established beyond peradventure that it is improper to sandbag one's opponent by raising new matter in reply.' . . . Typically, in such situations, the Court strikes the evidence presented for the first time in reply, and does not consider it for purposes of ruling on the motion.") (first alteration in original) (citations omitted).

For example, Plaintiff provides the Court no evidence that Deutsche Bank uses Unique Transaction Reference numbers, or "UTRs," when conducting wire transfers.   Nevertheless, easily available internet publications show that at least some financial institutions use UTRs, and, when they do, the transaction's date is embedded in the string of characters assigned to the transaction.   (Lichtman Decl. Exs. 7-10.)   Prompted by a significant red flag—*i.e.*, that documents purporting to evidence three different transactions use the same Unique Transaction Reference—a reasonable investigation would have included, at the very least, checking to see whether the numbers conform to publicly available information about how such numbers are generated.   Here, that could not have happened.

Instead, Plaintiff asserts without citation that multiple and different transactions normally share the same UTR because those numbers do not refer to transactions at all.   (Opp. 25.) Instead, and despite the plain language of their labels, Plaintiff claims a Unique Transaction Reference refers only to banks, not to transactions, such that *all* transactions involving "Deutsche Bank AG, Frankfurt" would have the same "UTR."   (*Id.*)   There is no objective evidence for this bewildering assertion, which asks the Court to believe that international banks use "transaction" numbers only to refer to financial institutions and, even more bizarrely, that such banks use the term "Unique Transaction Reference" to designate what is neither unique nor a transaction. Plaintiff cites only the Bobarykin Affidavit, given by Plaintiff's CEO, who claims no specialized knowledge of the codes used in Unique Transaction References.   This inadmissible testimony lacks foundation, and does not purport to establish that an investigation was conducted.[7]

---

[7] Plaintiff also never attempts to explain the mystery of why a bank would use the UTR to identify itself when Deutsche Bank also is clearly identified in the documents by "SWIFT CODE: DEUTDEFFXXX." (*See, e.g.*, FAC Exs. 5, 9; Lichtman Decl. Ex. 2.)

Still other red flags identified in the Motion are left completely unaddressed.   Plaintiff cannot explain how a SWIFT message purporting to evidence the €3 billion transaction (FAC Ex. 6) has an "issue date" of "03 FEB 2016" that does not match the alleged transaction date, October 7, 2015, listed on a separate SWIFT message purporting to evidence the same transaction (FAC Ex. 5).   Further, Plaintiff does not address the peculiarity that Hestiun's account numbers on Exhibit 5 and Exhibit 6 to the FAC do not match.   And Plaintiff offers no cogent explanation of how, elsewhere in the documents, an account number that had been attributed to Hestiun on Exhibit 5 is associated instead with Maybrook.   (FAC Ex. 9 at 3, 12; Ex. 12 at 2.)   Any of these inconsistencies should have prompted a reasonable pre-filing investigation.   That this case was filed—and then amended—despite these obvious inconsistencies demonstrates that insufficient pre-filing investigation was conducted.

Plaintiff's arguments also raise additional inconsistencies, beyond those in the Motion. Pivoting away from the UTR problem, Plaintiff argues, without evidence, that the alleged wire transfers are properly and uniquely identified by their "transaction ID/code," which is created by an unidentified "compliance department," pursuant to uncited "European Banking Regulations," and only "*usually* contains the month and year when the contract was signed."   (Opp. 25 (emphasis added).)   But these assertions cannot be squared with the two "transaction ID/codes" that Plaintiff claims uniquely identify the wire transfers at issue, which have different syntax and structure from each other in terms of where the numbers that *might* be read as date references occur and in what order.   (*Compare* FAC Ex. 5 ("STS-NRV/VDS-**15/09/72**-BVV-17-51") *with* FAC Ex. 9 at 13 ("DEUT:DEUT:HVBK/MFGL-AJE/**10.02.2017**") (emphasis added).)[8]

---

[8] Moreover, if these numbers really served as unique references for the transactions at issue, one would reasonably expect them to have the same label across transactions and the documents that

Plaintiff also attaches various contract documents with scanned images of the contracting parties' passports and listing passport numbers in signature blocks.   On Exhibit 6, the U.S. passport number of Robert Kim, identified as CEO of NRG Co., is recorded as "711111310." (Opp. Ex. 6.)   But in Exhibit 9, Robert Kim's passport shows U.S. passport number "530879197." (Opp. Ex. 9.)   This inconsistency is left unaddressed.

In the end, Plaintiff's Opposition does not explain what investigation, if any, Plaintiff's counsel conducted before filing, despite Woori Bank's letters of April 5 and April 12, 2018, and extensive submission of June 15, 2018.   The red flags are too numerous and significant to ignore. Given the strong, direct evidence that the transactions at issue did not occur, the lack of such an investigation is remarkable and supports Rule 11 sanctions here.   *See Gelfman Int'l Enters. v. Miami Sun Int'l Corp.*, 2009 WL 2242331, at *10 (E.D.N.Y. July 27, 2009) ("Rule 11 'explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading *before it is signed.*'") (emphasis added) (quoting *Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998)).

## C.   Plaintiff's FAC Was Brought For An Improper Purpose

Woori Bank's Motion showed that Plaintiff's lawsuit is harassing, contributes to delay, and increases the cost of litigation to Defendants.   (Mot. 21-22 (citing *Morely v. Ciba-Ceigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995)).)   Plaintiff brought this case in New York State Court after bringing two previous lawsuits addressing the same subject matter, which have been dismissed—one in Korea for the €3 billion wire transfer and one in California for the €5 billion transfer—evidence of forum shopping.

---

record them—but they do not.   Exhibit 9 to the FAC calls this number the "TRANSACTION CODE," for the alleged €5 billion transaction, whereas Exhibit 5 calls it the "TRANSACTION ID," for the €3 billion transaction, and two different numbers on the page use that label. (*Compare* FAC Ex. 5 *with* Ex. 9 at 13.)

In its Opposition, Plaintiff defends its decision to bring this case in the courts of New York State by attempting to attack the integrity of the South Korean court system in connection with the Korean Litigation.[9]   Plaintiff argues the court was biased against NRG Co., the plaintiff in that case, and refused to consider any of its evidence.   Plaintiff cites two declarations in support, neither of which is admissible for what it purports to show.

The declaration of Kwak, Il-Yong (also spelled Il-young) identifies the declarant as the principal of "YS Tech, Holdings Ltd."   (Opp. Ex. 5 48-1 ¶ 1.)   This entity is not a party here, is not alleged to be a party to the Korean Litigation, and is not otherwise identified in the FAC as having any role at all.   The declarant claims to have "entered into a contract to purchase precious commodities with AJ Energy, LLC's Korean Partner Company NRG Co. Ltd. and became a partner in the investment, along with AJ Energy and NRG."   (*Id.* ¶ 2.)   The declarant does not purport to have any personal knowledge about the transaction at issue and the testimony is therefore inadmissible as evidence that it occurred.[10]   He avers that he submitted three civil complaints against Woori Bank to the Financial Supervisory Services ("FSS") in Seoul, and that the FSS declined to hear the claims.   (*Id.* ¶¶ 5, 8, 11.)

These civil complaints are not evidence of bias.   On its face, this declaration, even if credited, merely states that a non-party brought three failed attempts to involve a Korean agency in

---

[9] Plaintiff claims that Woori Bank counts the removal of this case to federal court as one of the previous lawsuits.   (Opp. 4.)   Woori Bank's Motion in fact only faults Plaintiff for failing to reveal the existence of the Korean Litigation and the California Litigation.   (Mot. 5.)

[10] Indeed, the Declaration of Kwak, Il-Yong lacks foundation and should be disregarded by the Court.   *See Grodotzke v. Seaford Ave. Corp.*, 17 F. Supp. 3d 185, 188 n.2 (E.D.N.Y. Apr. 28, 2014) (stating that contracts are inadmissible where "no evidentiary foundation [was] offered"); *Gissinger v. Yung*, 2007 WL 2228153, at *3 (E.D.N.Y. July 31, 2007) (excluding exhibits offered as evidence based on a failure to lay a proper evidentiary foundation).

the subject matter of this lawsuit.   That evidence has no logical relationship to whether *this* case was brought for an improper purpose.

Plaintiff also relies on the declaration of Cheong Ho-yeon, who claims to be legal counsel for Plaintiff and NRG Co. in Korea.   (Opp. Ex. 16 ¶ 1.)   Remarkably, the declarant claims to have submitted statements by the CEO and CFO of Deutsche Bank to the court in the Korean Litigation, but does not attach those purported statements here.   (*Id.* ¶ 1.)   The declarant further faults the Korean court for asking Deutsche Bank's Seoul office about the alleged €3 billion transaction because "Deutsch[e] Bank Seoul is merely an affiliate that pays royalties to Deutsche Bank AG, Frankfurt."   (*Id.* ¶ 2.)   The declarant offers no foundation or other support for that assertion.[11] The declarant also claims to have filed a civil complaint with the FSS, to no avail.

Again, even crediting everything asserted in the declaration, Plaintiff has identified no reason for this Court to conclude that the Korean courts were biased against NRG, much less Plaintiff.   The declaration identifies no rule of court or other norm that was violated by the decision-making process as described in the declaration.   The declarant does not purport to identify any irregularity in the Court's judgment or the FSS's response.   This declaration is not evidence related to whether Plaintiff had a proper purpose in bringing this suit; it is an extended complaint about losing in the Korean Litigation.

Having failed to prove a problem with the Korean court system, Plaintiff launches an extended and completely unsubstantiated tale of political and financial intrigue, involving recent Korean presidential politics, and even murder.   Ultimately, Plaintiff claims that "Im Jong-seok, Chief Presidential Secretary and North Korea supporter" holds power in Korea that will prevent

---

[11] Just like the Kwak Declaration, the Declaration of Cheong Ho-Yeon can and should be disregarded because of this lack of foundation.   (*See, supra*, n.10.)

Plaintiff from getting a fair trial and that "[n]o one working Plaintiff's behalf in South Korea is safe at this time." (Opp. 3-4.) There is, of course, not one shred of evidence offered for any of Plaintiff's "background information" about Korea. (*Id.* 2.) Indeed, if Plaintiff's purported communications with high-level Korean ministers had any basis in reality, Plaintiff would have attached some document—such as an email or a contract—in support. The story is facially unbelievable and, more importantly, irrelevant to any issue contemplated by Rule 11.

Finally, Plaintiff blames two of its prior attorneys for being disloyal without explaining why, even if that were true, such disloyalty is relevant to Woori Bank's Motion. Woori Bank's Motion places at issue why Plaintiff brought this case after unsuccessful litigation elsewhere. It is no answer to call the previous counsel disloyal.

## D.      Plaintiff's Unreasonable Failure To Withdraw This Lawsuit Is Also Sanctionable

Woori Bank's Motion demonstrated that, even when a complaint complies with Rule 11 when initially filed, if it is later learned "that their allegations on the central (and dispositive) issue in the case were 'utterly lacking in support,'" the failure to withdraw the pleading is sanctionable. *Galin v. Hamada*, 283 F. Supp. 3d 189, 203 (S.D.N.Y. 2017) (quoting *StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 307 (2d Cir. 2014)), *appeal filed*, No. 17-2988 (2d Cir. Sept. 27, 2017). Here, Plaintiff not only failed to withdraw the FAC, but has twice defended it in letters to the Court. (Dkt. 39 at 1 ("Our complaint is as detailed as it can be."); Dkt. 42 ("Our complaint stands as it is.").)

Plaintiff's only answer to Woori Bank's argument is to accuse Woori Bank of "bullying," and to rehash the arguments addressed above. (Opp. 26-27.) For all those same reasons, Plaintiff's claims remain completely unsubstantiated, and the failure to withdraw the FAC is sanctionable.

## IV. PLAINTIFF'S REQUEST FOR SANCTIONS SHOULD BE DENIED

Plaintiff's request for sanctions against Woori Bank must be denied.   In its letter to this Court dated July 19, 2018 (Dkt. 39 at 2), Plaintiff first intimated that it might file a motion for sanctions against Woori Bank.   To date, Plaintiff has filed no formal motion against Woori Bank, although its Opposition argues for sanctions in a variety of places, interwoven among the arguments opposing Woori Bank's Motion.   Indeed, the Table of Contents in the Opposition, filed only 15 days after that July 19 Letter, provides no single point heading that purports to set forth the factual and legal bases for Plaintiff's quest for the imposition of sanctions.

If the July 19 Letter is the touchstone for Plaintiff's request that sanctions be imposed, and if it were to be construed in the light most generous to Plaintiff, it raises only two issues: (1) Mr. Kaba's location in New York makes it impossible for him to obtain the information from Deutsche Bank in Frankfurt to conclude that the transactions at issue here did not occur; and (2) Woori Bank "intentionally misconstrued" the meaning of account numbers, SWIFT codes, and UTRs.   (*Id.*)

As demonstrated above (*supra*, Section III.A.1; *see also* Mot. 12-13), Mr. Kaba's affidavit establishes that he was well situated within Deutsche Bank for the investigative task of determining whether the transactions affecting the stated accounts ever took place.   His qualifications and his efforts are stated in his affidavits.   (Kaba Aff. ¶¶ 1-2; Kaba Supp. Aff. ¶¶ 1-2, 4-5.)   In stark contrast, Plaintiff's concern with Mr. Kaba's authority to arrive at his conclusions is at best speculation, based on Plaintiff's equating Deutsch Bank's structure with McDonald's and the unsworn statements from unknown individuals staffing a customer service line.   (*See supra* Section III.A.1.)   The Kaba affidavits on their face are admissible evidence from a witness who has specialized training to marshal relevant facts.   Because Plaintiff's amalgam of hearsay and conjecture cannot be considered a "red flag" at all, sanctions are clearly not warranted on this issue.

22

Plaintiff's complaint regarding Woori Bank's understanding of the meaning and usage of Unique Transaction References is likewise built on illogic and an evidentiary void.   As shown above (*supra*, Section III.B; *see also* Mot. 3-4, 20), Woori Bank's interpretation comports with banking convention and common sense, and has been supported by relevant sources explaining the UTR system.   On the other hand, Plaintiff provides no sources to corroborate illogical notion that the UTR does not refer to any unique transaction after all, other than the self-serving affidavit of Mr. Bobarykin, who claims no specialized knowledge on this issue and cites no source.   Because such unreliable statements cannot be the foundation for a reasonable investigation by Plaintiff of the obvious incongruities in the documents that Plaintiff relies upon as proof of its claims, it certainly cannot constitute the type of evidence Woori Bank should rely upon to judge those documents as irrefutably authentic and as a basis to withdraw its claims that cast doubt on the authenticity of those documents.   Accordingly, Woori Bank respectfully submits that Plaintiff's request for sanctions on this ground should be dismissed as well and that all requests by Plaintiff for sanctions be dismissed in their entirety.   *See Kim v. Kimm*, 884 F.3d 98, 106-07 (2d Cir. 2018) (affirming denial of sanctions where moving party did not demonstrate a violation of Rule 11); *accord Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, -- F. Supp. 3d ----, 2018 WL 3830065, at *9-11 (S.D.N.Y. Aug. 13, 2018).

## V. CONCLUSION

For the foregoing reasons, the Court should grant Woori Bank's Motion and deny

Plaintiff's request for sanctions.


Respectfully submitted,

Dated: August 17, 2018
      New York, New York

/s/   *Jeffrey S. Lichtman*
Jeffrey S. Lichtman
O'HARE PARNAGIAN LLP
85 Broad Street, 16th Floor
New York, New York 10004
Tel: (212) 425-1401
Fax: (212) 425-1421
Email:     jlichtman@ohareparnagian.com

*Co-Counsel for Woori Bank*